matter to be determined after the evidence has been presented.[1]

Reversed and remanded with directions.

In re Grand Jury Subpoena of Alphonse PERSICO, Appellant.

No. 880, Docket 75–2030.

United States Court of Appeals, Second Circuit.

Argued March 19, 1975.

Decided June 19, 1975.

---

44

L. Stone, Departmental Attys., U. S. Dept. of Justice, of counsel), for appellee.

Nancy Rosner, New York City, for appellant.

David G. Trager, U. S. Atty., E. D. N. Y., by William I. Aronwald and Robert Del Grosso, Special Attys., U. S. Dept. of Justice (Sidney M. Glazer and Victor D.

Before SMITH and TIMBERS, Circuit Judges, and WEINSTEIN, District Judge.[*]

WEINSTEIN, District Judge:

The record of full hearings and arguments and of a series of affidavits and other documents fully supports the trial

[*] Jack B. Weinstein of the United States District Court for the Eastern District of New York, sitting by designation.

judge's determinations that appellant contemptuously refused to answer questions before a grand jury and that no questions to him were based on unlawful electronic surveillance. His claim, though unfounded, that the government attorney who questioned him before the grand jury lacked power to do so, requires more extended treatment. At stake is the power of the Department of Justice's Organized Crime Strike Force to effectively prosecute crime.

## I. FACTS

Alphonse Persico was subpoenaed in January of 1974 to appear before a grand jury sitting in the Eastern District of New York, investigating infiltration of racketeers into legitimate businesses. 18 U.S.C. § 1962. He was given testimonial immunity and testified that he had an illegal gambling business involving "horses, sports and numbers," but he refused to identify his employees on the ground that the questions were the result of illegal electronic surveillance. Judge Judd rejected this argument, found Persico in civil contempt, and sentenced him to no more than sixty days in the custody of the United States Marshal. 28 U.S.C. § 1826(a). The order was affirmed. *In re Persico,* 491 F.2d 1156 (2d Cir.), *cert. denied sub nom. Persico* v. *United States,* 419 U.S. 924, 95 S.Ct. 199, 42 L.Ed.2d 158 (1974).

After the sentence had been served, the government re-subpoenaed Persico to appear before the same grand jury. He moved for an order requiring: (1) a demonstration by the attorneys of the Justice Department's Organized Crime Strike Force of their authority to conduct grand jury proceedings; and (2) filing of affidavits affirming or denying electronic surveillance of Persico's attorney and of several named places in which Persico had a proprietary interest or was known to frequent.

Again Judge Judd ordered Persico to testify. Once more he appeared before the grand jury, was granted testimonial immunity anew, and refused to testify concerning the identity of those involved in his enterprises. Following a hearing and receipt of affidavits and other documents supporting the government's contention that there was no basis for believing that any illegal electronic surveillance had occurred, Judge Judd found Persico in contempt and sentenced him to incarceration for the remainder of the grand jury's term.

Conducting proceedings before the grand jury was Robert Del Grosso, a Special Attorney of the Organized Crime Section of the Justice Department's Criminal Division, assigned to the Strike Force office investigating organized crime in the Eastern District of New York. He operates under the supervision of the Assistant Attorney General in charge of the Criminal Division, the Chief of the Organized Crime Section and the Deputy Section Chief who are in Washington, and the locally based Attorney-in-Charge of the Eastern District Strike Force field office. The latter coordinates his efforts with the United States Attorney for the Eastern District of New York, who signs applications for immunity orders and indictments returned by the grand jury. In briefs and appearances in court, Mr. Del Grosso is listed as appearing on behalf of the United States Attorney.

The government contends that the Strike Force attorney was properly authorized to appear before the grand jury for the reason, among others, that he bore a commission signed by the Assistant Attorney General in charge of the Criminal Division. The commission states the attorney's authority in broad and general terms:

"November 30, 1972

"Dear Mr. Del Grosso:

"The Department is informed that there have occurred and are occurring in the Eastern District of New York and other judicial districts of the United States violations of federal criminal statutes by persons whose identities are unknown to the Department at this time.

"As an attorney at law you are specially retained and appointed as a Spe-

cial Attorney under the authority of the Department of Justice to assist in the trial of the aforesaid cases in the aforesaid district and other judicial districts of the United States in which the Government is interested. In that connection you are specially authorized and directed to file informations and to conduct in the aforesaid district and other judicial districts of the United States any kind of legal proceedings, civil or criminal, including grand jury proceedings and proceedings before committing magistrates, which United States Attorneys are authorized to conduct.

"Your appointment is extended to include, in addition to the aforesaid cases, the prosecution of any other such special cases arising in the aforesaid district and other judicial districts of the United States.

"You are to serve without compensation other than the compensation you are now receiving under existing appointment.

"Please execute the required oath of office and forward a duplicate thereof to the Criminal Division.

"Sincerely,

(signed) HENRY E. PETERSEN
Assistant Attorney General"

The validity of this commission under the terms of 28 U.S.C. § 515(a) constitutes the primary issue posed by the appellant in this case. That section appears to require a specific direction of the Attorney General (or, as demonstrated below, a properly authorized Assistant Attorney General). It reads:

"The Attorney General or any other officer of the Department of Justice, or *any attorney* specially appointed by the Attorney General under law, *may, when specifically directed* by the Attorney General, *conduct* any kind of legal proceeding, civil or criminal, including *grand jury proceedings* and proceedings before committing magis- ―――s, which United States attorneys authorized by law to conduct, her or not he is a resident of the

district in which the proceeding is brought." (Emphasis supplied.)

It is the contention of appellant that the commission constitutes a "roving authority" rather than the specific direction required by section 515(a). As demonstrated below, when viewed in context, the government attorney who carries such a letter has little more freedom to rove than a cog in the clock on the courthouse lobby wall. Even if the authority permitting his appearance before a grand jury was limited by the phrase "specifically directed," the statute would be satisfied. To understand why that is so, we turn first to a consideration of some of the problems faced by the Department of Justice, in their historical setting.

## II. ALLEGED THREAT OF ORGANIZED CRIME AND RESPONSE OF THE FEDERAL GOVERNMENT

Since World War II the public has become increasingly aware, largely through a succession of Congressional investigations, of charges respecting the awesome dimensions of organized criminal activity in this country. *See, e. g.,* Hearings Before the Special Senate Comm. to Investigate Organized Crime in Interstate Commerce, 81st Cong., 2d Sess. and 82nd Cong., 1st Sess., pts. 1–15 (1950–51); Senate Select Comm. on Improper Activities in the Labor or Management Field, 1st Interim Rep., Sen.Rep.No. 1417, 85th Cong., 2d Sess. (1958); *Id.,* 2d Interim Rep., Sen.Rep.No. 621, 86th Cong., 1st Sess., pts. 1–2 (1959); *Id.,* Final Rep., Sen.Rep.No. 1139, 86th Cong., 2d Sess., pts. 1–4 (1960); Hearings Before the Permanent Subcomm. on Investigations of the Senate Comm. on Gov't Operations on Gambling and Organized Crime, 87th Cong., 1st Sess., pts. 1–3 (1961); Senate Comm. on Gov't Operations, Organized Crime and Illicit Traffic in Narcotics, Sen.Rep.No. 72, 89th Cong., 1st Sess. (1965); Hearings Before the Permanent Subcomm. on Investigations of the Senate Comm. on Gov't Operations on Labor Racketeering Activities, 89th Cong., 2d Sess. (1966); Hearings Before

a Subcomm. of the House Comm. on Gov't Operations on the Federal Effort Against Organized Crime, 90th Cong., 1st Sess. (1967); House Comm. on Gov't Operations, Federal Effort Against Organized Crime, H.R.Rep.No. 1574, 90th Cong., 2d Sess. (1968); Hearings Before a Subcomm. of the House Comm. on Gov't Operations on the Federal Effort Against Organized Crime: Role of the Private Sector, 91st Cong., 2d Sess. (1970); Hearings Before the Permanent Subcomm. on Investigations of the Senate Comm. on Gov't Operations on Organized Crime and Securities: Thefts and Frauds, 93rd Cong., 1st Sess., ser. 2 (1973). *See also* Hearings Before a Subcomm. of the Senate Comm. on Commerce on Investigation of So-Called "Rackets," 73rd Cong., 2d Sess. (1933); E. Kefauver, Crime in America (1968); R. Kennedy, The Enemy Within (1960).

Organized crime has been defined as an intricate, centralized, nationwide network of persons engaged primarily in "crimes that cannot be perpetrated profitably by small criminal systems." D. Cressey, Organized Crime and Criminal Organizations 10 (1971). A Presidential Commission has characterized organized crime as,

> "[A] society that seeks to operate outside the control of the American people, and their governments. It involves thousands of criminals working within structures as complex as those of any large corporation, subject to laws more rigidly enforced than those of legitimate governments. Its actions are not impulsive, but rather the result of intricate conspiracies carried on over whole fields of activity in order to amass huge profits."

President's Commission on Law Enforcement and Administration of Justice, Task Force Report on Organized Crime (1967), cited in House Comm. on Gov't Operations, Federal Effort Against Organized Crime, H.R.Rep.No. 1574, 90th Cong., 2d Sess. 3–4 (1968). It has been said to be,

> "a criminal syndicate consisting of families operating as criminal cartels in large cities across the Nation, banded together in an organization with what corresponds to a board of directors at the top to settle problems, such as jurisdictional disputes, and to enforce discipline."

*Id.* at 4.

Some law enforcement officials believe that organized criminals are engaged in gambling, loan sharking, narcotics, and many other crimes and that they have moved into legitimate unions and businesses by force, by purchase, and by corruption of public officials. It has been charged that they

> "currently control all but a tiny part of the illegal gambling in the United States. They are the principal usurers (loan-sharks), and the principal importers and wholesalers of narcotics. They have infiltrated certain labour unions, where they extort money from the employees and, at the same time, cheat the members of the union. [They] have a virtual monopoly on some legitimate enterprises, such as distribution of cigarette vending machines and juke boxes, and they own a wide variety of legitimate retail firms, restaurants and bars, banks, hotels, apartment houses, trucking companies, food corporations, linen-supply houses, office buildings, factories, and even garbage-collection routes. They have corrupted officials in the legislative, executive and judicial branches of government at the local, state and federal levels."

> "Measured by amount of profit, [organized crime] is one of America's largest business enterprises. The U. S. President's Commission in 1967 estimated that confederated crime cost Americans almost nine billion dollars a year—more than all other types of crime combined, and just about double the amount spent annually in the United States for all police, court and correction work."

D. Cressey, Organized Crime and Criminal Organizations 10–11 (1971). *See also* House Comm. on Gov't Operations, Federal Effort Against Organized Crime,

H.R.Rep.No. 1574, 90th Cong., 2d Sess., 4–5 (1968); Johnson, Organized Crime: Challenge to the American Legal System, 53 J.Crim.L.C. & P.S. 399, 402–406 (1962). In short, Congress and the Executive have grounds to conclude that these are purveyors in a kind of supermarket of crime, with demonstrated capacity and inclination to violate almost any criminal law included in the United States Code.

Not only has the effect of organized crime on the nation's well-being reportedly been pervasive, but it has been largely immune to law enforcement efforts. Alleged participants are exceedingly difficult to prosecute. It is believed, first, that they are typically part of a hierarchy with the highest command level insulated by a series of management echelons from the lowest level of easily-replaceable members who actually perform observable physical acts. Johnson, Organized Crime: Challenge to the American Legal System, 53 J.Crim.L.C. & P.S. 399, 416–417 (1962); D. Cressey, Theft of the Nation, The Structure and Operation of Organized Crime in America, 109–161 (1969); Senate Comm. on Gov't Operations, Organized Crime and Illicit Traffic in Narcotics, Sen.Rep.No. 72, 89th Cong., 1st Sess., 7–8 (1965). Second, a code of silence is said to prevail among members concerning their operations. D. Cressey, Theft of the Nation, The Structure and Operation of Organized Crime in America 177, 186–220 (1969); Senate Comm. on Gov't Operations, Organized Crime and Illicit Traffic in Narcotics, Sen.Rep.No. 72, 89th Cong., 1st Sess. 12 (1965); Johnson, Organized Crime: Challenge to the American Legal System, 53 J.Crim.L.C. & P.S. 399, 417 (1962). Third, prosecution is hindered by fear of physical and economic sanctions against potential witnesses. Johnson, Organized Crime: Challenge to the American Legal System, 53 J.Crim.L.C. & P.S. 399, 416–417 (1962).

These difficulties are illustrated by the case before us. An admitted leader of an illegal gambling ring has brazenly refused to testify before a grand jury despite a grant of immunity.

Finally, organized crime reportedly utilizes corruption of political institutions and investigative agencies to protect itself from prosecution. Johnson, Organized Crime: Challenge to the American Legal System, 53 J.Crim.L.C. & P.S. 399, 419–422 (1962); D. Cressey, Theft of the Nation, The Structure and Operation of Organized Crime in America 248–289 (1969); J. Gardiner, The Politics of Corruption, Organized Crime in an American City (1970); House Comm. on Gov't Operations, Federal Effort Against Organized Crime, H.R.Rep.No.1574, 90th Cong., 2d Sess. 8 (1968); G. Tyler, Organized Crime in America 15 (1962).

These obstacles led one local law enforcement official to conclude:

"We are gnawing away at one or two heads of a many-headed Hydra, without knowing with certainty where the other heads are, or where the rest of the body extends."

Statement of Suffolk Co., N.Y. Police Commissioner Thom Before N.Y. State Commission of Investigation on April 22, 1960, cited in D. Cressey, Theft of the Nation, The Structure and Operation of Organized Crime in America 290 (1969).

Because of the pervasive and interstate nature of suspected organized crime, a fragmented law enforcement approach can meet with only limited success. House Comm. on Gov't Operations, Federal Effort Against Organized Crime, H.R.Rep.No. 1574, 90th Cong., 2d Sess. 10 (1968); Note, The Strike Force: Organized Law Enforcement v. Organized Crime, 6 Colum.J.L. & Soc.Prob. 496, 500–502 (1970); Johnson, Organized Crime: Challenge to the American Legal System, 53 J.Crim.L.C. & P.S. 399, 418–419 (1962).

After the revelations of the Kefauver Committee (Hearings Before the Special Senate Committee to Investigate Organized Crime in Interstate Commerce, 81st Cong., 2d Sess. and 82nd Cong., 1st Sess., pts. 1–15 (1950–51)), the federal government formed an Organized Crime and Racketeering Section within the Justice Department. House Comm. on Gov't

Operations, Federal Effort Against Organized Crime, H.R.Rep.No.1574, 90th Cong., 2d Sess. 12–13 (1968). But it was not until Robert Kennedy became Attorney General that a major federal effort began. *Id.* at 14–15; Note, The Strike Force: Organized Law Enforcement v. Organized Crime, 6 Colum.J.L. & Soc. Prob. 496, 503–505 (1970). He expanded the Organized Crime and Racketeering Section, greatly increased its activities, began to centralize the compilation of organized crime data, and obtained a dramatic increase in convictions. Note, The Strike Force: Organized Law Enforcement v. Organized Crime, 6 Colum. J.L. & Soc.Prob. 496, 505 (1970). *See generally* V. Navasky, Kennedy Justice 44–95 (1971).

Difficulties remained in coordinating the numerous separate federal and state law enforcement efforts. House Comm. on Gov't Operations, Federal Effort Against Organized Crime, H.R.Rep.No. 1574, 90th Cong., 2d Sess., 74–80 (1968). It was troublesome to induce the variety of federal investigative agencies—*e. g.,* Secret Service, Internal Revenue, Federal Bureau of Investigation, Customs, and Immigration—to share their information. *See United States* v. *Schipani,* 289 F.Supp. 43, 47–53 (E.D.N.Y.1968), aff'd, 414 F.2d 1262 (2d Cir. 1969), *cert. denied,* 397 U.S. 922, 90 S.Ct. 902, 25 L.Ed.2d 102 (1970).

In an effort to stimulate the drive against organized crime, which had declined ,after Attorney General Kennedy's departure, and to provide on-the-scene federal coordination and involvement, the Justice Department in 1966 began establishing specialized organized crime prosecutorial offices in a number of cities. Note, The Strike Force: Organized Law Enforcement v. Organized Crime, 6 Colum.J.L. & Soc.Prob. 496, 497–498, 507–519 (1970). These Strike Force offices were placed under the control of the Organized Crime and Racketeering Section. *Id.* at 507–509. In this Circuit offices were organized in Brooklyn and Manhattan. This court, therefore, has had ample opportunity to ob-

serve the difficulties faced in prosecuting alleged organized criminals, the organization of the Strike Forces and the fruits of their work. *Cf.* Rule 201, Fed.R. of Evid. (judicial notice).

Strike Force efforts have been widely publicized, receiving particular emphasis in Justice Department annual reports. At Congressional budget hearings there have been extensive inquiries into the role and performance of the Strike Forces, followed by approval through annual budgetary authorizations. *See* Hearings on a Department of Justice 1968 Budget Request Before a Subcomm. of the House Comm. on Appropriations, 90th Cong., 1st Sess., 199–216, 275–281, 303–305 (1967); Hearings on a Department of Justice 1969 Budget Request Before a Subcomm. of the House Comm. on Appropriations, 90th Cong., 2d Sess., 124–126, 133–134, 199–209, 234–242 (1968); Hearings on a Department of Justice 1970 Budget Request Before a Subcomm. of the House Comm. on Appropriations, 91st Cong., 1st Sess., 216, 227, 238–241, 376–394, 437, 447–451 (1969); Hearings on a Department of Justice 1971 Budget Request Before a Subcomm. of the House Comm. on Appropriations, 91st Cong., 2d Sess., 197–198, 208–211, 338–345, 353, 363, 409–413 (1970); Hearings on a Department of Justice 1972 Budget Request Before a Subcomm. of the House Comm. on Appropriations, 92d Cong., 1st Sess., 345, 364–366, 497–504, 508–513, 521–531, 564–574, 577–578 (1971); Hearings on a Department of Justice 1973 Budget Request Before a Subcomm. of the House Comm. on Appropriations, 92d Cong., 2nd Sess., 327, 475–481, 492, 508–511, 540–547 (1972); Hearings on a Department of Justice 1974 Budget Request Before a Subcomm. of the House Comm. on Appropriations, 93d Cong., 1st Sess., 494, 504, 514–524, 545 (1973); 115 Cong. Rec. 10041–10043 (daily ed. April 23, 1969) (President's message on organized crime and remarks of Rep. Ford); President's Message to Congress on Crime and Law Enforcement of Feb. 7, 1968, W'kly Compil. of Pres. Doc's. 243–244 (Feb. 12, 1968).

### III. ORGANIZATION OF STRIKE FORCES

■ In view of the complex and intricate tasks of Strike Force attorneys, and of the extreme difficulty of prosecuting alleged organized crime, specific authority and supervision is necessarily based on daily evaluations by authorities in Washington and in the field rather than on a single document in the form of a commission issued at the beginning of an attorney's service. Continuing control from Washington is to be expected since the aim of the Strike Forces is,

"to achieve maximum coordination among federal agencies and between those agencies and the attorneys in the Department of Justice responsible for prosecuting organized criminals. . . The members of the strike force work with each other on a daily basis and out of the same office. Together they plan and implement a coordinated attack on organized criminal activity in their area. Each representative supervises his agency's part in the overall investigative plan. There is continuous communication regarding ongoing investigations. The result is an integrated and purposeful accumulation of information designed to maximize the opportunities for successful prosecution."

Note, The Strike Force: Organized Law Enforcement v. Organized Crime, 6 Colum.J.L. & Soc.Prob. 496, 498 (1970).

Excerpts from the detailed guidelines establishing the relationship between Strike Forces and United States Attorneys Offices are set forth as an appendix to this opinion. Order No. 431–70, Attorney General of the United States, April 20, 1970. They, along with the literature in the field, and our own observations of cases in our courts, furnish for the purposes of this case, sufficient basis for an understanding of how the Strike Force attorneys are controlled.

The Department of Justice is an extremely complex organization headed by the Attorney General. *See* 28 C.F.R. Chapt. 1. *See also* L. A. Huston, The Department of Justice 54 (1967) (organizational chart). It is divided into a series of (1) offices, such as that of the Deputy Attorney General who supervises the Executive Office for United States Attorneys and an office of Criminal Justice with "an overview of the criminal justice system" (28 C.F.R. §§ 0.15–0.17), and the Solicitor General (28 C.F.R. §§ 0.20–0.21); (2) Divisions, such as the Antitrust, Civil and Criminal Divisions (28 C.F.R. §§ 0.40–0.78); and (3) Administrations, Services, Bureaus, and Boards, such as the Federal Bureau of Investigation, the Bureau of Prisons, the Drug Enforcement Administration, and the United States Marshals Service (28 C.F.R. §§ 0.85–0.129–2). There is even an explicit provision in the Code of Federal Regulations governing the resolution of "jurisdictional" disagreements among the various units of the Department. 28 C.F.R. § 0.195.

Delegated to the Criminal Division are a variety of functions including those assigned to the Organized Crime and Racketeering Section which is responsible for

"Coordination of enforcement activities directed against organized crime and racketeering."

28 C.F.R. § 0.55(g). In connection with his duties, the Assistant Attorney General in charge of the Criminal Division is authorized to act for the Attorney General in securing special grand juries and depositions required in the prosecution of "organized criminal activity." 28 C.F.R. § 0.59. He is also authorized to "designate attorneys to present evidence to grand juries in all cases . . . supervised by his division." 28 C.F.R. § 0.60.

Before a Strike Force begins its work there is a gathering of personnel from various agencies of the government, intensive training, compilation of intelligence, and designation of the individuals to be investigated. *See generally* Note, The Strike Force: Organized Law Enforcement v. Organized Crime, 6 Colum. J.L. & Soc.Prob. 496, 511–515 (1970).

Beyond the coordination between the United States Attorney and the local

Strike Force Attorney-in-Charge, each of the Strike Forces is managed and supervised on a day-to-day basis by the Organized Crime and Racketeering Section. This section consists of a Chief and four Deputy Chiefs. The Chief of the Organized Crime and Racketeering Section reports to the Assistant Attorney General in charge of the Criminal Division. Each Deputy Chief is responsible for the operation of those Strike Forces in the geographical area assigned to him. There is almost daily contact between each local Strike Force and the Organized Crime and Racketeering Section in Washington with respect to the status of pending investigations.

Prior to the filing of an indictment the Strike Force submits to the Organized Crime and Racketeering Section a prosecution memorandum setting forth the evidence obtained as a result of its investigation. This memorandum contains the Strike Force attorney's recommendations on whether a prosecution should be instituted. Indictments are not filed until prosecution is authorized by the Organized Crime and Racketeering Section.

Daily reports are forwarded to Washington by the Strike Forces concerning the filing of indictments and all other significant court actions such as convictions, acquittals and pleas of guilty. These reports are transmitted by the Organized Crime and Racketeering Section to the Attorney General through the Office of the Assistant Attorney General in charge of the Criminal Division.

Each Strike Force has an Attorney-in-Charge who is directly responsible for the work of those attorneys assigned to that Strike Force. All indictments, prosecutions, memoranda, immunity authorization requests, wiretap applications, and nolle prosequis are reviewed and approved by the Attorney-in-Charge and the local United States Attorney before they are filed.

Where it is deemed necessary to reassign a Strike Force attorney from one permanent duty station to another, an order is issued, signed by the Assistant Attorney General in charge of the Criminal Division, or the Deputy Attorney General, or one of their duly authorized representatives. Before being permitted to travel on a per diem basis, in connection with a specific duty assignment, a Strike Force attorney is required to obtain a travel authorization from the Department of Justice.

Such central, yet flexible, control of the work of the Strike Force is essential when dealing with alleged national crime syndicates. Note, The Strike Force: Organized Law Enforcement v. Organized Crime, 6 Colum.J.L. & Soc.Prob. 496, 514 (1970). As one commentator put it:

"The effectiveness of the strike force depends on two important factors: (1) the strike force as an institutionalized structure with agents as members and (2) overall coordination by [Organized Crime and Racketeering] in Washington."

*Id.* at 520.

As the guidelines in Appendix A suggest, there is also active cooperation between the local United States Attorney and the local Strike Force personnel. The primary responsibility of the United States Attorney to prosecute crimes in the district is recognized. Decentralization is not ignored.

The commission itself, then, does not begin to express the specific limitations on Mr. Del Grosso's authority. It places him as a unit in a tight bureaucratic hierarchy controlled by the Attorney General in Washington through a direct line of subordinates. Mr. Del Grosso cannot roam freely through the country prosecuting whom he pleases for whatever crimes he can get any grand jury to charge. He is assigned by higher authority in Washington to a specific district and he can move outside that district only when ordered by his superiors in Washington to do so. He can only investigate those persons and crimes related to organized criminal activity as his superiors from time to time allow. Let him step out of line into other areas and the local United States Attorney, jealous of his prerogatives, will refuse to

sign indictments and will complain forcefully to the Attorney General in Washington. The Executive Office for United States Attorneys, under the Deputy Attorney General, has assistant directors for each area of the country who devote considerable attention to resolving such conflicts between the local United States Attorneys and the Strike Forces. The reaction through orders from the Attorney General and his subordinates to overreaching by a member of the Strike Force will likely be swift. The practical controls on a member of the Strike Force who does not understand his limited powers will be brought to bear. If the Attorney General be too laggard in bringing his Strike Force subordinates to heel, our heavy machinery of checks and balances would come wheeling into place. The United States Attorney for the District may appeal to Congressional and other forces; a call from Congress will alert the Attorney General to his duties to control his subordinates in the exercise of their limited powers. And, as a final check, the district courts have powers to control abusive prosecution.

All of this mass of paperwork, guidelines, tradition and practical reality of political science must be read into a commission. A Strike Force attorney, no matter how broad his commission, is under virtually constant specific direction and control. The situation here is quite unlike that we would face were the Attorney General to grant such a commission to a single person outside the bureaucratic structure who might take action and incur fiscal and other liabilities for the government without limit.

## IV. RELATIONSHIP BETWEEN LOCALLY AND CENTRALLY CONTROLLED PROSECUTORS

### A. *History*

While this challenge concerns the ability of one Strike Force attorney to appear before one grand jury, in a larger sense it calls into question the federal government's ability to effectively organize its prosecutorial apparatus. The problem of centralized versus decentralized control of criminal law enforcement is at least as old as the Roman Empire. *See* F. Abbott, A History and Description of Roman Political Institutions, 284–285, 346–349, 363–364, 367–368, 371–372 (1901).

In England, from about 1253 onward, the crown had its own attorney, known after 1461 as the Attorney General, to bring prosecutions in the ruler's name. *See* J. Norton-Kyshe, The Law and Privileges Relating to the Attorney General and Solicitor General of England i–xv, 1–6 (1897). The Attorney General was empowered to prosecute such cases as he chose—generally those seriously endangering the public peace or government. *See* 4 Blackstone's Commentaries 308–309 (W.D.Lewis ed., 1922); I Chitty, Criminal Law 842–848 (Perkins ed., 1841). American colonies generally followed the contemporary English model of strong prosecutorial powers vested in an Attorney General. *See* O. W. Hammonds, The Attorney General in the American Colonies (1 Anglo-American Legal History Series No. 2, 1939); H. Cummings and C. McFarland, Federal Justice 8–15 (1937).

Our American experiment in federalism reduced the problem since the primary burden of maintaining internal tranquility was assumed by the states. Nevertheless, the issue remained and grew more troublesome as the national government exercised greater powers.

After the American Revolution, the Continental Congress, functioning pursuant to the Articles of Confederation, contemplated creating an office of Attorney General, with authority to prosecute all suits for the United States in federal and state courts. H. Cummings and C. McFarland, Federal Justice 16 (1937); Journal of the Continental Congress XIX, 156 (1912).

The Judiciary Act of 1789, which created the federal court system, while it called for an Attorney General at the Capitol, adopted a scheme of federal prosecution primarily at the local level.

It provided for the appointment of

"a meet person, learned in the law to act as *attorney-general* for the United States . . . *to prosecute* and conduct *all suits in the Supreme Court* in which the United States shall be concerned, and to give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching any matters that may concern their departments." (Emphasis supplied.)

Judiciary Act of 1789, § 35, 1 Stat. 93. The Judiciary Act also provided for *United States Attorneys in each judicial district*

"*to prosecute* . . . *all delinquents for crimes* and offenses, cognizable under the authority of the United States, and all civil actions in which the United States shall be concerned." Judiciary Act of 1789 § 35, 1 Stat. 92. (Emphasis supplied.)

Since the Attorney General was required to appear only in the Supreme Court, there was doubt about his ability to appear in other courts. As Attorney General Cummings observed,

"This wording of the thirty-fifth section of the Judiciary Act may have been accidental. Those who desired only a federal Supreme Court, leaving the trial work to state courts, would not likely object to confining the Attorney General to the Supreme Court. The original draft of the Judiciary Act had proposed that the district and Supreme Courts each appoint the attorney to appear before them on behalf of the government. Under such an arrangement it was but natural for the duties of those attorneys to be limited to the courts which had appointed them. When this plan of appointment was abandoned, the wording of the section was not revised and the Attorney General remained charged only with the duty of appearing before the Supreme Court."

H. Cummings and C. McFarland, Federal Justice 16 (1937). *See also* Warren, New

Light on the History of the Judiciary Act of 1789, 37 Harv.L.Rev. 49, 108–111 (1923).

Early Attorneys General did not view the Judiciary Act as limiting their ability to appear before federal courts other than the Supreme Court. They took active roles prosecuting a number of early cases in federal trial courts. H. Cummings and C. McFarland, Federal Justice 31, 38, 44, 48, 60, 90 (1937); IV The Works of Alexander Hamilton 588–589 (J. Hamilton ed. 1851). They participated in the drafting of indictments and may well have appeared before grand juries in a few cases. F. Wharton, State Trials of the United States During the Administrations of Washington and Adams 77–78 (1849 ed.); H. Cummings and C. McFarland, Federal Justice 31, 38, 44, 48 (1937); H. Adams, The Life of Albert Gallatin 148 (1879 ed.).

Because Attorneys General were provided with only skeletal staffs until after the Civil War (L. Huston, The Department of Justice 9–11 (1967); J. Easby-Smith, The Department of Justice 6 (1904)), however, and because they were preoccupied with growing requests for advisory opinions and with expanding Supreme Court litigation, the local district attorneys remained all but completely independent. *See* H. Cummings and C. McFarland, Federal Justice 218–220 (1937); Wirt, Attorney General and District Attorneys, 1 Op.Att'y Gen. 608–611 (1823); Taney, The Jewels of the Princess of Orange, 2 Op.Att'y Gen. 482, 491–492 (1831) (power of the President, acting through the Attorney General, to issue directions to United States district attorneys); Cushing, Office and Duties of the Attorney General, 6 Op.Att'y Gen. 326, 335–336, 347–349 (1854). Thus, prior to the Civil War, federal prosecutorial efforts were almost completely decentralized, with authority vested in the hands of local United States Attorneys.

The crisis of the Civil War compelled Attorney General Bates to renew a proposal of the first Attorney General, Edmund Randolph, to make supervision of district attorneys a duty of the Attorney

General. H. Cummings and C. McFarland, Federal Justice 218–219 (1973). In 1861 Congress followed this recommendation. It also authorized the Attorney General to appoint special assistants to United States district attorneys to assist the Attorney General in the performance of his duties. Act of August 2, 1861, 12 Stat. 285 c. 37, Rev.Stat. § 363 (now codified, as modified, at 28 U.S.C. § 543(a)).

After the creation in 1870 of the Department of Justice, the Attorney General obtained authorization to name special attorneys to aid the Attorney General in the "trial of any case." Act of June 22, 1870, 16 Stat. 162 c. 150, § 17, Rev.Stat. §§ 364–366 (now codified, as modified, at 28 U.S.C. § 518(b)). In order to employ such special attorneys, the Attorney General was required to certify that the services of the special attorneys

"were actually rendered, and that the same could not be performed by the Attorney-General, or solicitor-general, or the officers of the department of justice, or by the district attorneys."

Act of June 22, 1870, 16 Stat. 164 c. 150, § 17, Rev.Stat. § 365. The requirement of certification in section 365 was added to avoid unnecessary expenditures and abuses by persons without supervision. *See United States v. Crosthwaite,* 168 U.S. 375, 379, 18 S.Ct. 107, 108, 42 L.Ed. 507 (1897) ("It was left to [the Attorney General] to determine whether public interests required the employment of special counsel"). *Cf.* 31 U.S.C. § 665(b); Wickersham, Employment of Retired Army Officer, 30 Op.Att'y Gen. 51 (Feb. 7, 1913); *United States v. Morse,* 292 F. 273 (S.D.N.Y.1922).

Armed with these provisions, Attorneys General made extensive use of special attorneys. They employed them in grand jury proceedings as well as trials. House Judiciary Comm., Report on H.R. 17714, H.R.Rep.No. 2901, 59th Cong., 1st Sess. at 1 (1906).

During the Grant administration, the Attorney General, at the head of the new Department of Justice, began exercising direct authority over federal district attorneys in an effort to supervise the enforcement of Reconstruction laws designed to protect newly-enfranchised black citizens from widespread Ku Klux Klan terrorism in Southern states. H. Cummings and C. McFarland, Federal Justice 230–249 (1937). As part of this effort it appears that some members of the Department of Justice staff were dispatched to the South to assist local United States attorneys. *Id.* at 242. This program marked the first widespread use of prosecutorial authority by the Attorney General. It stands as historical precedent for the centralized efforts of the organized crime Strike Forces. *See also* Dixon, The Attorney General and Civil Rights 1870–1964, in Roles of the Attorney General of the United States, 105–110 (L. A. Huston, et al., eds. 1968). More recently, important tax, civil, land, antitrust and civil rights cases have been increasingly controlled from Washington through the various divisions in the Department of Justice set up for that purpose.

### B. *Summary of Present Powers of Attorney General*

The Executive Branch—specifically, the Attorney General—has the power to conduct federal criminal litigation. 28 U.S.C. § 516. It is "an executive function within the exclusive prerogative of the Attorney General." *United States v. Cox,* 342 F.2d 167, 190 (5th Cir.), *cert. denied sub nom. Cox v. Hauberg,* 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965), (Wisdom, *J.,* concurring). Under the broad ambit of applicable statutes the Attorney General may appoint officials "to detect and prosecute crimes against the United States." 28 U.S.C. § 533. He has supervision of all litigation in which the United States is a party and is commanded to "direct all United States Attorneys, assistant United States Attorneys, and special attorneys . . . in the discharge of their respective duties." 28 U.S.C. § 519. He may appoint assistant United States Attorneys in any district in which they reside (28 U.S.C. §§ 542, 545) or "appoint

special attorneys, regardless of their residence, to assist United States Attorneys when the public interest so requires." 28 U.S.C. §§ 542, 543. He may direct any officer of the Department of Justice to conduct and argue any case in any court of the United States. 28 U.S.C. § 518. He also may direct "any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General under law . . . when specifically directed by the Attorney General" to "conduct any kind of legal proceeding . . . including grand jury proceedings." 28 U.S.C. § 515(a). Under the Attorney General's supervision, the United States Attorney, an appointee of the President, has the duty, "except as otherwise provided by law," to prosecute all offenses against the United States within his district. 28 U.S.C. § 547.

Since 28 U.S.C. § 509, deriving from the Reorganization Acts of 1949 and 1950, vests all functions of the Department of Justice, with some limited exceptions, in the Attorney General, the statute for delegation appearing in 28 U.S.C. § 510 is essential so that he may "make such provisions as he considers appropriate authorizing the performance by any officer . . . of any function of the Attorney General." *See United States v. Giordano*, 416 U.S. 505, 513, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974).

Recently, the Supreme Court considered these principles and some of these statutes in ruling on the justiciability issue involving the Watergate Special Prosecutor and the President in *United States v. Nixon*, 418 U.S. 683, 694–696, 94 S.Ct. 3090, 3101, 41 L.Ed.2d 1039 (1974). The Supreme Court pointed out:

"Under the authority of Art. II, § 2, Congress has vested in the Attorney General the power to conduct the criminal litigation of the United States Government. 28 U.S.C. § 516. It has also vested in him the power to appoint subordinate officers to assist him in the discharge of his duties. 28 U.S.C. §§ 509, 510, 515, 533. Acting pursuant to these statutes, the Attorney General has delegated the authority to represent the United States in these particular matters to a Special Prosecutor with unique authority and tenure."

418 U.S. at 694, 94 S.Ct. at 3100.

In sum, the Attorney General has authority to assign other officers of the Department of Justice, not only under 28 U.S.C. § 515, but also under the other statutes giving him power over criminal litigation. If it were otherwise, his broad power to enforce the criminal laws of the United States would be seriously hampered at its inception—the initiation of a criminal case by presenting evidence before grand juries.

We have focused thus far on the general authority of the Attorney General over federal criminal cases. But this power must be considered in conjunction with that of grand juries since no serious criminal case may be commenced without a grand jury indictment. A grand jury has wide latitude to conduct an inquiry into violation of criminal laws. As the Supreme Court recently observed in *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974):

"Traditionally the grand jury has been accorded wide latitude to inquire into violations of criminal law. No judge presides to monitor its proceedings. It deliberates in secret and may determine alone the course of its inquiry. The grand jury may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials. 'It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited . . . by doubts whether any particular individual will be found properly subject to an accusation of crime.' *Blair v. United States*, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979, (1919)."

■ Both the power of the Attorney General to designate an attorney to conduct a grand jury inquiry and the power of the grand jury to investigate would be circumscribed, despite the principles expressed in *Calandra* and *Blair*, if the Attorney General could not direct that his assigned officer question within the entire scope of the inquiry. Otherwise the proceeding would be restricted to the area of the authority of the Justice Department lawyer; questions by jurors themselves outside these bounds would be out of order. It would inhibit its freedom "to pursue its investigations unhindered by external influence or supervision . . . ." *United States* v. *Dionisio*, 410 U.S. 1, 16–17, 93 S.Ct. 764, 773, 35 L.Ed.2d 67 (1973). The Attorney General's power to assign attorneys to a grand jury inquiry is of necessity as broad as the inquiry itself or, in other words, as broad an inquiry as "United States attorneys are authorized by law to conduct." 28 U.S.C. § 515(a).

### C. *28 U.S.C. § 543*

Moving from the broad statutory framework under which the Attorney General conducts the criminal litigation of the United States, the plain language of 28 U.S.C. § 543 suggests that the Attorney General has the power to assign an attorney of the Department of Justice to conduct a grand jury inquiry with the same breadth as an inquiry conducted by a United States Attorney. Section 543 gives the Attorney General power to appoint "attorneys to assist United States attorneys when the public interest so requires." This grant of power is similar to his authority under section 542 to appoint Assistant United States Attorneys "when the public interest so requires." Neither statute contains any words of limitation on the power of these appointees to conduct criminal proceedings, including grand jury proceedings. No authority suggests that an Assistant United States Attorney cannot conduct a broad grand jury inquiry by virtue of his office. A departmental or special attorney appointed under section 543 would likewise appear to be subject

to no limitation. The letter of appointment of Mr. Del Grosso might, then, reasonably be read as an appointment under this section.

■ There remains the question of whether the organizational structure of the Strike Forces precludes a conclusion that its attorneys were appointed to "assist" (28 U.S.C. § 543) the United States Attorney. The close relationship between Strike Forces and the United States Attorneys revealed in the Appendix to this opinion supports a finding that investigation and prosecution of "organized crime" in a particular district constitutes assistance to the United States Attorney for that district. Where, as here, the United States Attorney reviews and signs all indictments and organized crime prosecutions are coordinated with his work, the attorneys of the Strike Force are "assisting" the United States Attorney.

While authority for centralized prosecutorial efforts by the Justice Department, such as the Strike Forces offices, provides a context for interpretation and understanding, it is not dispositive where specific statutes are applicable. We turn, therefore, to an analysis of the genesis and interpretation of section 515(a) of Title 28, the most narrowly drawn of the relevant provisions.

### D. *28 U.S.C. § 515(a).*

#### 1. *Language of § 515(a)*

Section 515(a) provides that an attorney may be "specifically designated" to conduct "any kind of legal proceedings . . . which United States Attorneys are authorized by law to conduct." The letter of authorization in question expressly tracks the statute, stating that the attorney is "specifically authorized and directed to file informations . . . and to conduct . . . any kind of legal proceedings . . . including grand jury proceedings . . . which United States Attorneys are authorized to conduct." Plain meaning arguably permits the Attorney General to give the assigned attorney a specific direction to conduct grand jury proceedings to the

same extent as the United States Attorney. Upon this basis, then, the letter of authorization might be deemed sufficient.

Even if the words "specifically directed" are read to require a specific limitation in the proceedings to which a special attorney is assigned, it does not necessarily follow that this construction is applicable to regular attorneys of the Department of Justice. The statute applies to three categories of attorneys: the Attorney General, any officer of the Department of Justice, and an attorney specially appointed by the Attorney General. The phrase "specifically directed" obviously does not apply to the Attorney General himself. The thrust of the 1870 Congressional debates and enactments suggest that specific direction was only necessary for specially-hired counsel, not regular Justice Department attorneys. Cong.Globe, 41st Cong., 2d Sess., pt. 4, 3036–3039 (1870); Act of June 22, 1870, 16 Stat. 162 c. 150, § 17. *See also, United States* v. *Denton,* 307 F.2d 336, 338 (6th Cir. 1962), *cert. denied,* 371 U.S. 923, 83 S.Ct. 292, 9 L.Ed.2d 232 (1963). Since section 510 permits the Attorney General to delegate this power to other officers of the department, there is reason to read section 515(a) to make the phrase "specifically directed" inapplicable to "any officer of the Department of Justice." "Specifically directed" might be read—though the syntax is severely strained—to be applicable only to "any attorney specially appointed by the Attorney General who may, when specifically directed," conduct any kind of legal proceeding.

Under this reading, Mr. Del Grosso would have had legal authority to conduct a broad grand jury inquiry. As a regular attorney in the Department of Justice, he qualifies under common usage as an officer of the Department of Justice. *See, e. g.,* the use by the Supreme Court of that term in *United States* v. *Giordano,* 416 U.S. 505, 513–516, 94 S.Ct. 1820, 1825–1827, 40 L.Ed.2d 341 (1974).

Nevertheless, reading out of section 515(a), as it applies to officials, the words "specifically directed" seems unwarranted in view of the relevant statutory history of this 1906 provision. This is the subject to which we now turn.

### 2. *Legislative History of § 515(a)*

#### a. *Precursor limitations on outside counsel*

The 1861 and 1870 Acts serve as background for our consideration of the 1906 Act. By the Act of August 2, 1861, 12 Stat. 285 c. 37, as already noted, Congress provided that the Attorney General was "charged with the general superintendence and direction of the [district] attorneys . . . as to the manner of discharging their respective duties." He was also

> "empowered, whenever in his opinion the public interest may require it, to employ and retain (in the name of the United States) such attorneys and counselors-at-law as he may think necessary to assist the district-attorneys in the discharge of their duties, and shall stipulate with such assistant counsel the amount of compensation."

*Id.* § 2. The latter section is now codified, in modified form, as 28 U.S.C. § 543(a).

The Act of June 22, 1870, 16 Stat. 162 c. 150, which created the Department of Justice was, in large measure, adopted in reaction to abuses in the employment of outside counsel, including the payment of excessive fees and the sometime inferior quality of their services. *See, e. g.,* Cong.Globe, 41st Cong., 2d Sess., pt. 4, 3036–37, 3038 (1870) (Remarks of Rep. Jenckes and Lawrence):

> "Retainers of $3,000 and $7,500 have been sent to counsel in other parts of the United States. Some have rendered service, and some we cannot find rendered any at all.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> "In some instances the amount paid one single attorney for a series of years has largely exceeded the whole salary of the Attorney General."

Section 17 of the 1870 Act (16 Stat. 162, 164) provided that the need for outside counsel was to be publicly stated prior to their employment, and the scope of their commission was not to exceed this stated need. In addition it had to be certified that no personnel of the Department of Justice could do the job—clearly implying Washington's power and duty to send experts from the Capitol to take over those prosecutions where there were special needs:

> "[N]o counsel or attorney fees shall hereafter be allowed to any person or persons, . . . for services in such capacity to the United States, or any branch or department of the government thereof, *unless* hereafter authorized by law and then only *on the certificate of the Attorney-General* that such services were actually rendered, and *that the same could not be performed by* the Attorney-General, or solicitor-general, or *the officers of the department of justice, or by the district attorneys.* And every attorney and counsel[l]or who shall be specially retained, under the authority of the Department of Justice, to assist in the trial of any case in which the government is interested, shall receive a commission from the head of said Department as a special assistant to the Attorney-General, or to some one of the district attorneys, as the nature of the appointment may require, and shall take the oath required by law to be taken by the district attorneys, and shall be subject to all the liabilities imposed upon such officers by law." (Emphasis added.)

16 Stat. 162, 164 § 17.

In the Congressional debates it was made clear that the Attorney General would be held responsible for the expenditure of funds to retain outside counsel and for the quality of their performance. Cong.Globe, 41st Cong., 2d Sess., pt. 4, 3036–3037 (1870). This was to be accomplished by requiring that the need for outside counsel and the purposes for which he was retained be specified on the face of each special commission "in order that [counsel] may be responsible to him [the Attorney General] and to the government for the performance of their duties." Cong.Globe, 41st Cong., 2d Sess., pt. 4, 3035 (1870).

Congress, in establishing the Department of Justice, apparently showed no concern that its employees would interfere with the functions of the district attorneys and gave the Attorney General power to use the persons he employed to attend to any interest of the United States. The primary Congressional concern was that limited commissions be granted to outside counsel so that their responsibility to the Attorney General would be clearly evidenced.

### b. *Rosenthal, Cobban and Twining Cases*

Three contemporaneous district court cases provide a background for consideration of the 1906 Act, now section 515(a). *United States* v. *Rosenthal*, 121 F. 862 (S.D.N.Y.1903), the case section 515(a) was designed to deal with, is critical.

Merchants in New York were disturbed about the possible fraudulent importation of silk at the Port of New York. They consulted their own private attorney, one Wickham Smith, who, after inquiry, suggested that they ask the President of the United States and the Attorney General to investigate the matter. When the Attorney General responded that he lacked funds, the merchants offered to pay Mr. Smith's expenses. He was then appointed by the Attorney General to investigate "alleged fraudulent importation of Japanese silks at the Port of New York" and "to prepare and conduct such civil and criminal proceedings as may result." His compensation was to "be determined" on the completion of his services, but the expectation was that it would be paid by the merchants. Armed with this warrant, he proceeded to appear before a grand jury and obtain indictments against competitors of the silk merchants of New York.

On this peculiar state of facts it is not surprising that the district judge quashed the indictments. The danger in

permitting private persons to use the grand jury for their own purposes is obvious enough. *See Sutherland* v. *International Ins. Co. of N. Y.*, 43 F.2d 969 (2d Cir.), *cert. denied*, 282 U.S. 890, 51 S.Ct. 103, 75 L.Ed. 785 (1930).

While acknowledging the power of the Attorney General, or any person authorized by him, to conduct litigations and trials in any United States Court, the district judge drew a sharp distinction between trials and grand jury proceedings. Only the United States Attorney for the district or one of his assistants, he held, could present a matter to a grand jury.

There is no need to analyze again the statutory authority then extant to demonstrate how the same result could have been reached without taking so narrow a view of the Attorney General's power vis-a-vis grand juries. In fact, *United States* v. *Cobban*, 127 F. 713, 717 (D.Mont.1904), and *United States* v. *Twining*, 132 F. 129, 131–132 (D.N.J. 1904), both promptly rejected the *Rosenthal* construction, of what is now 28 U.S.C. §§ 543 and 515(a).

Instead of relying on the courts to limit *Rosenthal* to its special facts, Congress, acting on the Attorney General's request, shortly thereafter adopted a statute. It affirmed his power, that of other officers of the Department of Justice, and persons he specially designated, to conduct proceedings before federal grand juries.

### c. *Act of June 30, 1906*

The express purpose of the bill as reflected in the House Committee report was to overrule the broad holding in *Rosenthal.*

"The purpose of this bill is to give to the Attorney General, or to any officer in his Department *or to any attorney specially employed by him*, the same rights, powers, and authority which district attorneys now have or may hereafter have in presenting and conducting proceedings before a grand jury or committing magistrate." (Emphasis supplied.)

House Judiciary Comm., Report on H.R. 17714, H.R.Rep. No. 2901, 59th Cong., 1st Sess. 1 (1906).

When the report discussed the employment of "special counsel," it was obviously concerned primarily with specially-retained outside counsel. Nevertheless, the language of the report is sufficiently broad to support the interpretation that Congress wished the local district attorneys to handle grand jury matters except where there was a special reason to have another attorney appear. The House Report that accompanied the legislation read in part:

"It has been the practice of the Attorney-General for many years to employ special counsel to assist district attorneys in the prosecution of suits pending in their respective districts whenever the public interest demanded it. It has been the practice of such special counsel to appear, with the district attorney, before grand juries and committing magistrates and to assist in the proceeding pending there. This right passed unchallenged for many years, until the circuit court for the southern district of New York, on March 17, 1903, [decided] the case of the *United States* v. *Rosenthal.* . . .

"[The *Rosenthal*] decision makes the proposed legislation necessary if the Government is to have the benefit of the knowledge and learning of its Attorney-General and his assistants, or of such special counsel as the Attorney-General may deem necessary to employ to assist in the prosecution of a *special case*, either civil or criminal. As the law now stands, only the district attorney has any authority to appear before a grand jury, no matter how important the case may be and no matter how necessary it may be to the interests of the Government to have the assistance of one who is *specially or particularly qualified* by reasons of his *peculiar knowledge and skill* to properly present to the grand jury the question being considered by it.

"The Attorney-General states that it is necessary, in the due and proper ad-

ministration of the law, that he shall be permitted to employ special counsel to assist the district attorney in cases [requiring special skill] *which district attorneys* or lawyers *do not generally possess, and in cases of [un]usual importance to the Government*, and that such counsel be permitted to possess all of the power and authority, in *that particular case*, granted to the district attorney, which, of course, includes his right to appear before a grand jury either with the district attorney or alone.

\* \* \* \* \* \*

"There can be no doubt of the advisability of permitting the Attorney-General to employ *special counsel in special cases*, and there can be no question that if he has been employed because of his *special fitness* for such *a special case* that the Government should have the full advantage of his learning and skill in every step necessary to be taken before the trial, including that of appearing before grand juries. The law proposed by the bill under consideration seems to be very necessary, because of the decision in the Rosenthal case, hereinbefore referred to, and the committee recommend its speedy enactment." (Emphasis supplied.)

House Judiciary Comm., Report on H.R. 17714, H.R.Rep. No. 2901, 59th Cong., 1st Sess. (1906).

The Senate version of what is now § 515(a) did not contain the House language that the special attorney be "specifically directed by the Attorney General" (*see* 40 Cong.Rec. 7913–14 (1906)), and the accompanying Senate Judiciary Committee Report made no mention of a requirement that a special attorney's commission be specifically drawn. Senate Judiciary Comm., Report on S. 2969, Sen.Rep. No. 3835, 59th Cong., 1st Sess. (1906). The Senate, however, acceded to the House version of the bill. *See* 40 Cong.Rec. 9662 (1906) (Remarks of Senator Kean).

Certainly the House Report should be read against Congress' contemporary

concern with ensuring that the Attorney General's power to appoint special outside counsel did not become subject to financial abuse. *See* discussion in *United States* v. *Crosthwaite*, 168 U.S. 375, 381, 18 S.Ct. 107, 109, 42 L.Ed. 507 (1897) (construes Act of June 22, 1870, 16 Stat. 162, 164, c. 25 §§ 16–17, Rev.Stat. §§ 363–366, as intending to "protect the treasury from the expense incident to the employment of special counsel"). *See also, Wall* v. *United States*, 384 F.2d 758, 763 (10th Cir. 1967); *United States* v. *Denton*, 307 F.2d 336, 338 (6th Cir. 1962), *cert. denied*, 371 U.S. 923, 83 S.Ct. 292, 9 L.Ed.2d 232 (1963); Cong.Globe, 41st Cong., 2d Sess., pt. 4, 3035–3039 (1870). During the same year that § 515(a) was enacted, Congress passed an Act of Feb. 27, 1906, 34 Stat. 48, now codified as 31 U.S.C. § 665(b). This provision aimed "to prevent the [Executive] Departments from incurring financial obligations over and above those authorized by Congress" through claims for extra or unauthorized services. Wickersham, Employment of Retired Army Officer, 30 Op. of Att'y Gen. 51, 53 (Feb. 7, 1913). *See also, United States* v. *Morse*, 292 F. 273 (S.D.N.Y.1922) (appointment of Special Counsel of Emergency Fleet Corporation as Special Assistant Attorney General, without additional compensation, does not violate § 665(b)). While these Congressional deliberations do not modify the House Report, they do provide illumination as to Congressional concerns and aims for section 515(a).

Nevertheless, the legislative history, fairly read, suggests that in addition to fiscal concerns, Congress did not wish to see the traditional primary role of the local district attorney before the grand jury reduced unless there was some special reason made explicit by the Attorney General. And this, the language of the statute seems to say, applied to full-time officers of the Department of Justice as well as to part-time private attorneys.

The form of the special direction that was required was not touched upon by the statute. Generally, the cases con-

struing section 515(a) have tended towards a liberal construction in favor of validity of the indictments.

### 3. Court Construction of Section 515(a)

Almost every case which has interpreted 28 U.S.C. § 515(a) favors the government. Challenges to the grand jury appearances of assigned attorneys, whether regular full-time government attorneys or specially retained part-time counsel, have been rejected on a number of grounds.

In *May v. United States*, 236 F. 495 (8th Cir. 1916) one Robert Childs was specially retained at $25.00 per day plus expenses pursuant to a letter signed by an Assistant Attorney General, to assist in the preparation and trial "in the Eastern District of Missouri," of "Oleomargarine Cases". After stating that the 1906 Act permitted the Attorney General to retain special counsel "personally or through his lawful assistants," the court indicated lack of sympathy with collateral attacks on the authority of an attorney with apparent authority to appear before a grand jury as a representative of the United States. It pointed out:

> "This is not a proceeding to try the title of Mr. Childs to the office of special assistant to the Attorney General for the purposes mentioned in the appointment. It is a motion to quash an indictment for the reason that an unauthorized person took part in the proceedings of the grand jury which resulted in the indictment. Such a motion only attacks the authority of Mr. Childs in a collateral way, and beyond all question he was a de facto officer, acting by color of authority, and his acts are valid until it is judicially declared by a competent tribunal in a proceeding for that purpose that he has no right to the office, the duties of which he is performing."

236 F. at 500.

*Shushan v. United States*, 117 F.2d 110 (5th Cir.), *cert. denied*, 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531 (1941), involved defendants who alleged that three "special assistants to the Attorney General participated in the proceedings before the grand jury without having been specifically directed to do so by the Attorney General." Each commission evidenced the appointment of the person named as "special assistant to the Attorney General" and specifically directed him to conduct in the Eastern District of Louisiana proceedings in which the United States was interested, "including grand jury proceedings." *Id.*, at 114. In some of the commissions there was mention of violations of the mail fraud statute by named persons "and other persons unknown." *Id.*, at 114. None of the commissions evidencing appointment specifically referred to any person indicted. The Court, in refusing to abate the indictment on this ground, noted:

> "We think it appears that these persons had and acted in an official status with respect to this case, and that the authority of each extended specifically to appearing in grand jury proceedings in the Eastern District of Louisiana in prosecutions under the mail fraud statute. The mention of persons supposed to be guilty was too general to restrict the authority to cases against them only. When a grand jury, which is an inquisitorial body, begins an investigation it cannot be known in advance whom they will indict. . . . *The words of Section 310* [now § *515(a)*], 'when thereunto specifically directed by the Attorney General, [to] conduct any kind of legal proceeding', *are mainly for the protection of the United States.* They do not require the naming of the persons or the particular cases to be prosecuted. Mail fraud cases in the Eastern District of Louisiana were specifically enough mentioned here, and we think it would be going too far to hold, at the instance of the accused, that the appointees were exceeding their authority in conducting this proceeding." (Emphasis supplied.)

117 F.2d at 114.

*United States v. Hall*, 145 F.2d 781 (9th Cir. 1944), *cert. denied*, 324 U.S. 871,

65 S.Ct. 1016, 89 L.Ed. 1425 (1945), is the only appellate case which concerned the use of officials of the Department of Justice, rather than specially retained outside counsel. Consequently, the opinion does not speak in terms of special commissions, oaths or salary limitations. Rather, it focuses on whether participation by officers of the Department of Justice was, in fact, authorized by the Attorney General. The court approved broad direct and indirect authorizations. It declared:

> "We are of the opinion and so hold that the authorization may be direct to each designated officer of the Department or it may be to an officer in immediate supervision over several other such officers and may include such authorization to any or all of the several. And we are further of the opinion and we so hold that such authorization need not be directed to specifically designated cases but may be designated and limited descriptively as was done in the instant case by the Attorney General when he authorized Mr. Brett and the attorneys under his immediate direction to act in the kind of cases, to-wit, such land cases as from time to time shall be assigned to the Los Angeles Lands Division office."

145 F.2d at 785.

■ Courts have generally held that a special attorney's commission need not specify the statutes under which the attorney is to investigate and prosecute or the specific prospective defendants. In *United States* v. *Amazon Industrial Chemical Corp.*, 55 F.2d 254, 256–257 (D.Md.1931), the court concluded that an omission in a commission letter of the particular federal statutes allegedly violated was a "mere matter of form and not of substance." *See also, United States* v. *Powell*, 81 F.Supp. 288, 291 (E.D.Mo.1948) (correct statutes need not be specified in commission letter). In *United States* v. *Morse*, 292 F. 273 (S.D. N.Y.1922), Judge Augustus Hand was confronted with two commission letters from the Attorney General authorizing a special attorney to investigate sales of stock. One of the letters authorized an investigation of specified companies and persons, pursuant to specified criminal statutes. Although the special attorney did not limit his investigation and subsequent indictments to the companies and persons named in the commission, the commission was upheld by Judge Hand, who warned that to require the commission to be more specific "would cause unnecessary inconvenience in enforcing the law." *Id.* at 276.

■ An individual case need not be specifically designated. In *United States* v. *Martins*, 288 F. 991, 992 (D.Mass.1923), a court found that to require a special attorney to be designated by the Attorney General in each particular case would be unnecessarily narrow and technical. In *United States* v. *Hall*, 145 F.2d 781 (9th Cir. 1944), already referred to, the court approved the Justice Department's establishment of a "Lands Division" office in the Southern District of California to which it assigned special attorneys who were authorized to conduct such "Lands Division" cases as might be assigned to them. The court reversed a district judge and upheld the commissions of special attorneys not directed to specifically designated cases. The fact that a commission failed to specify the nature of the investigation the special attorney was to undertake did not invalidate the commission. *United States* v. *Amazon Industrial Chemical Corp.*, 55 F.2d 254, 256 (D.Md.1931).

■ Authority to act as a special attorney continues even after the specific official granting the authority and signing the commission leaves office. *United States* v. *Morton Salt*, 216 F.Supp. 250, 255–256 (D.Minn.1962), aff'd per curiam, 382 U.S. 44, 86 S.Ct. 181, 15 L.Ed.2d 36 (1965). The commission when signed need not be filed with the court. *Belt* v. *United States*, 73 F.2d 888, 889 (5th Cir. 1934).

■ Three Circuits have implied that any challenge by defendants to commission letters as overbroad may be inap-

propriate since the "specifically directed" language in Section 515(a) was included to protect the government from abuse of discretion by a special attorney or unnecessary personnel expenditures by the Attorney General, not to limit the Attorney General's power to prosecute. *Wall* v. *United States*, 384 F.2d 758, 763 (10th Cir. 1967); *United States* v. *Denton*, 307 F.2d 336, 338 (6th Cir. 1962), *cert. denied*, 371 U.S. 923, 83 S.Ct. 292, 9 L.Ed.2d 232 (1963); *Shushan* v. *United States*, 117 F.2d 110, 114 (5th Cir.), *cert. denied*, 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed.2d 1531 (1941); *See also, United States* v. *Powell*, 81 F.Supp. 288, 291 (E.D.Mo.1948) (the statute is for "the protection of the United States" and should be construed to assist the government's business); *United States* v. *Martins*, 288 F. 991, 992 (D.Mass.1923) ("the statute should be given the meaning which is the more helpful and practical in the dispatch of the government's business, especially as this meaning has been placed upon it by the Department concerned").

While broadly drawn commissions have received support, the government faces a danger when commissions are too specific and narrow. *See, United States* v. *Cohen*, 273 F. 620 (D.Mass.1921) (because a special attorney's commission specified power to conduct grand jury proceedings, court construed that he did not have the right to file informations); *United States* v. *Huston*, 28 F.2d 451, 456 (N.D.Ohio 1928) (where commission specified two districts in which a special attorney was to operate, but indictments were returned in another district, the commission was insufficient because too narrowly drawn).

Running counter to the general pattern of cases tolerating increasingly broad commission letters was *United States* v. *Goldman*, 28 F.2d 424 (D.Conn. 1928). There the court found that a special attorney could not appear before a grand jury in a case not specified in his commission. The court expressed a fear that if the attorney's appearance was not disallowed "it would follow that the Attorney General of the United States could, under the act now under discussion, issue a roving commission without any limitations, extending to every district in the United States and embrace all criminal investigations." *Id.*, at 430. Supporting *Goldman*, there is dicta in some cases suggesting a somewhat more narrow interpretation of section 515(a). In *United States* v. *Morse*, 292 F. 273, 276 (S.D.N.Y.1922), the court suggested that the commission should be "sufficiently specific . . . [as] possible, if adequate power to deal with the situation without impairment of usefulness or unnecessary reduplication of labor were to be given." *See also, United States* v. *Hall*, 145 F.2d 781, 785 (9th Cir. 1944), *cert. denied*, 324 U.S. 871, 65 S.Ct. 1016, 89 L.Ed. 1425 (1945) (dicta to the effect that although a commission need not specifically designate cases it "may be designated and limited descriptively" such as by the designation "land cases").

 Such dicta should not be allowed to stand against the legislative history and the basic thrust of the case law on section 515(a). This conclusion is buttressed by holdings that the authority granted to special attorneys of the Justice Department should be equal to that held by assistants to a United States Attorney. *United States* v. *Morton Salt*, 216 F.Supp. 250 (D.Minn.1962), *aff'd per curiam*, 382 U.S. 44, 86 S.Ct. 181, 15 L.Ed.2d 36 (1965); *United States* v. *Sheffield Farms Co.*, 43 F.Supp. 1, 3 (S.D.N.Y.1942).

 Recent decisions dealing specifically with the Strike Force and Section 515(a) also support, with a few exceptions, the conclusion that Section 515(a) should be read to support an indictment wherever it is reasonable to do so. *See, supporting a broad Strike Force commission: United States* v. *Di Girlomo*, 393 F.Supp. 997 (W.D.Mo.1975) (Hunter, J.); *United States* v. *Lyberger*, No. 75–CR– 25 (N.D.Ill. March 24, 1975) (McGarr, J.); *United States* v. *Weiner*, 392 F.Supp. 81 (N.D.Ill.1975) (Bower, J.); *United States* v. *Jacobson*, 74–CR–936 (S.D.N.Y. March 3, 1975) (Frankel, J.); *In re Langella*,

No. '74–C–638 (E.D.N.Y. Feb. 27, 1975) (Dooling, J.); *Sandello* v. *Curran*, M–11–188 (S.D.N.Y. Feb. 27, 1975) (Tenney, J.); *United States* v. *Brown*, 389 F.Supp. 959 (S.D.N.Y.1975) (Pollack, J.); *United States* v. *Albanese*, No. 74–CR–814 (E.D. N.Y. Feb. 14, 1975) (Judd, J.); *United States* v. *Ferri*, No. 74–277 Crim. (W.D.Pa. Feb. 18, 1975) (Marsh, J.); *United States* v. *Brodson*, 390 F.Supp. 774 (E.D.Wis.1975) (Gordon, J.). See, opposing a broad Strike Force commission: *United States* v. *Agrusa*, 392 F.Supp. 3 (W.D.Mo.1975) (Oliver, J.); *United States* v. *Crispino*, 392 F.Supp. 764 (S.D. N.Y.1975 and March 24, 1975) (Werker, J.); *United States* v. *Wrigley*, 392 F.Supp. 9 (W.D.Mo.1975) (Oliver, J.); *United States* v. *Williams*, No. 74–CR–47–W–1 (W.D.Mo. Nov. 15, 1974) (Oliver, J.).

## V. INAPPROPRIATENESS OF TOO NARROW AN INTERPRETATION OF APPLICABLE PROVISIONS

■ The "specifically directed" phrase in Section 515(a) should not be so niggardly construed as to interfere with the federal government's ability to efficiently administer its criminal laws. Plain and intrinsic meaning can mislead when it ignores the thought and intent behind words in a changing world.

"To disregard the natural implications of the statute and to imprison our reading of it in the shell of mere words is to commit the cardinal sin in statutory construction, blind literalness."

*Pope* v. *Atlantic Coast R. Co.*, 345 U.S. 379, 392, 73 S.Ct. 749, 756, 97 L.Ed. 1094 (1953) (Frankfurter, J., concurring). See also, e. g., *United States* v. *Whitridge*, 197 U.S. 135, 143, 25 S.Ct. 406, 408, 49 L.Ed. 696 (1905) (Holmes, J.); *Borella* v. *Borden Co.*, 145 F.2d 63, 64–65 (2d Cir. 1945), aff'd, 325 U.S. 679, 65 S.Ct. 1223, 89 L.Ed. 1865 (1945) (Learned Hand, J.); *United States* v. *Fisher*, 2 Cranch (6 U.S.) 358, 386, 2 L.Ed. 304 (1805) (Marshall, C. J.); *Heydon's Case*, 3 Coke 7a, 76 Eng.Rep. 637 (Exchecquer 1584) ("the office of all the Judges is always to make such construction as shall suppress the mischief, and advance the remedy, and to suppress subtle inventions and evasions for continuance of the mischief, and pro privato commodo, and to add force and life to the cure and remedy, according to the true intent of the makers of the Act, pro bono publico"); Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527, 533 (1947); 1 Kent Commentaries on American Law 461–62 (1832 ed.).

On the theory that "a page of history is worth a volume of logic" (*N.Y. Trust Co.* v. *Eisner*, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921)), courts rely heavily on legislative history. See *Flora* v. *United States*, 362 U.S. 145, 151, 80 S.Ct. 630, 634, 4 L.Ed.2d 623 (1960); Landis, A Note on "Statutory Interpretation," 43 Harv.L.Rev. 886, 888–892 (1930). The difficulty with discovering legislative intent from this source alone is, of course, that a "legislature certainly has no intention whatever in connection with words which some two or three men drafted." Radin, Statutory Interpretation, 43 Harv.L.Rev. 863, 870 (1930).

■ Thus, inquiry into meaning may not be limited to an examination of materials contemporary with a bill's passage.

"An enactment is an organism in its environment. And the environment is not merely the immediate political or social context in which it is to be placed, but the whole traditional system of law and law enforcement, of recognized remedies and procedures which are the presuppositions of our law."

Frankfurter, Foreword to Symposium on Statutory Construction, 3 Vand.L.Rev. 365, 367 (1950). See also, Frank, Words and Music: Some Remarks on Statutory Interpretation, 47 Colum.L.Rev. 1259 (1947). As Justice Cardozo suggested, in making legislative interpretations courts must analyze "[w]hich choice is it the more likely the Congress would have made?" *Burnet* v. *Guggenheim*, 288 U.S. 280, 285, 53 S.Ct. 369, 370, 77 L.Ed. 748 (1933). See also, *Borella* v. *Borden Co.*,

145 F.2d 63, 64–65 (2d Cir. 1945) (Learned Hand, J.), aff'd, 325 U.S. 679, 65 S.Ct. 1223, 89 L.Ed. 1865 (1945); Horock, In the Name of Legislative Intention, 38 W.Va.L.Q. 119, 129 (1931).

In this connection it is useful to consider Professor Llewellyn's suggestion that we take account of the age of the statute.

> "[i]ncreasingly as a statute gains in age . . . its language is called upon to deal with circumstances utterly uncontemplated at the time of its passage. Here the quest is not properly for the sense originally intended by the statute, for the sense sought originally to be put in it, but rather *for the sense which can be quarried out of it in the light of the new situation.*" (Emphasis added)

Llewellyn, Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes are to be Construed, 3 Vand.L.Rev. 395, 400 (1950). The reasons for this position are grounded in the needs of government to react to new conditions in society if it is to survive:

> "[T]he judicial function is regarded today as administrative as well as interpretative. The court . . . must ask itself not only what the legislature means abstractly, or even on the basis of legislative history, but also what it ought to mean in terms of the needs and goals of our present day society. This approach is required by the insuperable difficulties of readjusting old legislation by the legislative process and by the fact that it is obviously impossible to secure an omniscient legislature."

Phelps, Factors Influencing Judges in Interpreting Statutes, 3 Vand.L.Rev. 456, 469 (1950).

 In this spirit of the need to recognize new problems, specific Congressional appropriations for a departmental activity often are interpreted as ratification of that activity. *Fleming* v. *Mohawk Co.*, 331 U.S. 111, 116, 67 S.Ct. 1129, 1132, 91 L.Ed. 1375 (1947); *Brooks*

v. *Dewar*, 313 U.S. 354, 361, 61 S.Ct. 979, 982, 85 L.Ed. 1399 (1941); *Isbrandtsen-Moller Co.* v. *United States*, 300 U.S. 139, 147, 57 S.Ct. 407, 411, 81 L.Ed. 562 (1937); *Holtzman* v. *Schlesinger*, 484 F.2d 1307, 1313 (2d Cir. 1973), cert. denied, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974); *Orlando* v. *Laird*, 443 F.2d 1039, 1042–43 (2d Cir.), cert. denied, 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113 (1971).

Of course, appropriation bills tend to become laden with many amendments, in the process of legislative compromise, that Congress would not necessarily validate if dealt with separately. But the facts here show not a last-minute amendment, but a highly-publicized government effort, examined in detail by the relevant committees, and approved annually since 1967.

 It is apparent, then, that the 1906 language must be interpreted against its historical background as well as the more recent needs expressed by both Congress and the President for a sustained attack against organized crime, of wide publicity given to Strike Force efforts, and of repeated Congressional approval of Strike Force appropriations. Yet, in moving beyond the confines of literal statutory language and of legislative history, courts must proceed cautiously for fear of overreaching their traditional role, particularly where statutes may be dangerously expanded to encroach on individual liberties. In the instant case, the dangers are reduced because legislative knowledge and approval of the purpose and need for which the interpretation is sought is not in the least equivocal.

 While Congress may not have specifically condoned broad grants of authority to particular special attorneys of the Justice Department's Strike Force, it authorized the Department to undertake a wide-ranging and effective attack on organized crime, of which the broad commission letters were an integral aspect. Congress is nothing if not pragmatic. It was aware that organized

crime is said to be like a chameleon. It would hardly have faulted the Attorney General for failing to list the crimes to be prosecuted when the task would require specification of almost every crime in Title 18 and almost every color of the spectrum of criminal conduct. Nor would it have expected that the names of prospective targets be announced; often they are not revealed until after the work in a grand jury is well under way. Some degree of secrecy and surprise is required before indictment. Specificity must be construed in a practical context.

 While a reading more favorable to the government is possible, for purposes of this case we prefer to adopt a more conservative interpretation, namely, that an officer or other full-time employee of the Department of Justice must be "specifically directed" to conduct grand jury proceedings if he is not a United States Attorney or an Assistant United States Attorney. We hold that such a specific direction to an attorney regularly employed on a full-time basis by the Department of Justice need not be embodied in a single written authorization, but may be implied from other writings, guidelines, practices and oral directions transmitted through a chain of command within the Department.

## VI. INAPPLICABILITY OF RULES OF CRIMINAL PROCEDURE LIMITING APPEARANCE BEFORE GRAND JURIES

 Nothing contrary to this interpretation of the relevant statutes is found in the Federal Rules of Criminal Procedure. The persons who may appear before a grand jury include "[a]ttorneys for the government." Rule 6(d). Fed.R.Crim.Pro. Rule 54(c) of the Federal Rules of Criminal Procedure defines those persons as including:

> "the Attorney General, *an authorized assistant of the Attorney General,* a United States Attorney, an authorized assistant of a United States Attorney . . . ." (Emphasis added.)

The original Advisory Committee Notes to Rules 6(d) and 54(c) indicate that the rules are to be read in accord with existing statutes, including 28 U.S.C. § 515(a) (codified before 1966 at 5 U.S.C. § 310). *See* West, 18 U.S.C.A. annot. to Rule 6 at 234 (1969). Our interpretation of Section 515(a) thus controls Rules 6(d) and 54(c).

This result accords with current views of the role of the grand jury. Even were *Rosenthal* soundly decided in 1903 on the theory that the sanctity of the grand jury should be protected against persons other than United States Attorneys and their assistants, its conceptual approach has been seriously eroded in the interim. *Cf.* I C. A. Wright, Federal Practice and Procedure §§ 106, 109 (1969). The reasons behind the requirement of secrecy in the grand jury have been summarized as follows:

> "(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations . . . ; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before the grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect the innocent accused who are exonerated from disclosure of the fact that he has been under investigation . . . ."

*United States* v. *Amazon Industrial Chemical Corp.,* 55 F.2d 254, 261 (D.C. Md.1931). *See also, e. g., United States* v. *Procter and Gamble Co.,* 356 U.S. 677, 681, n. 6, 78 S.Ct. 983, 986 n. 6, 2 L.Ed.2d 1077 (1958). None of these reasons have any applicability to the case before us.

## VII. POWER OF ASSISTANT ATTORNEY GENERAL TO EXERCISE AUTHORITY OF ATTORNEY GENERAL

 The contention that the Attorney General could not delegate his power

to assign government attorneys to the grand jury to the Assistant Attorney General in charge of the Criminal Division is without basis. Section 510 of Title 28 permits the Attorney General to delegate any of his functions to "any other officer" of the Department of Justice. By regulation, 28 C.F.R. §§ 0.55 and 0.60, the Attorney General delegated his power to designate attorneys to present evidence to grand juries in all cases "assigned to, conducted, handled, or supervised by the Assistant Attorney General in charge of the Criminal Division" to that Assistant Attorney General. This includes prosecution of all federal crimes not otherwise specifically assigned and the coordination of enforcement activities against organized crime and racketeering. *See May* v. *United States,* 236 F. 495, 499 (8th Cir. 1916); *United States* v. *Twining,* 132 F. 129, 130 (D.N.J.1904). Contrary to appellant's contention, apart from 28 C.F.R. § 0.60, which gives the Assistant Attorney General specific power to designate attorneys to appear before grand juries, the general authority given to him under 28 C.F.R. § 0.55 to prosecute all federal crimes embraces the power to assign attorneys to the grand jury.

As Judge Werker concluded in *United States* v. *Crispino,* 392 F.Supp. at 764 (S.D.N.Y.1975), a case involving the Strike Force:

> "[P]ower to appoint Special Attorneys was properly delegated to Mr. Petersen [the Assistant Attorney General in charge of the Criminal Division]. This is not a case of improper delegation as was found in *United States* v. *Giordano,* 416 U.S. 505 [94 S.Ct. 1820, 40 L.Ed.2d 341] (1974). That case involved a question of delegation of power to authorize wiretaps under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520. Section 2516(1) of that act allows the Attorney General or any Assistant Attorney General to authorize the application. The official who authorized the wiretap in *Giordano* was in fact the Executive Assistant to the Attorney General. The Court concluded that despite the broad delegation provision in 28 U.S.C. § 510, Congress in enacting § 2516(1) 'intended to limit the power to authorize wiretap applications by the Attorney General himself and to any Assistant Attorney General he might designate.' 416 U.S. at 514 [94 S.Ct. 1826]. In enacting section 515(a) . . . there was no limitation imposed on the Attorney General's ability to delegate his power of appointment of Special Attorneys to other officers of the Department of Justice such as Mr. Petersen." (Footnote omitted.)

■ Nor is it necessary, as appellant argues, that the letters of appointment contain a statement that the assignment of a particular attorney is at the direction of the Deputy Attorney General. The regulations give the Assistant Attorney General power to act, without first receiving approval from the Deputy Attorney General.

## VIII. CONCLUSION

■ The underlying fear is not of a broad commission but of an uncontrolled prosecution force. Most of us share with the nation's founders a concern that on occasion institutions will expand too far and abuse the powers granted to them. The potential abuses by a local United States Attorney are hardly comparable to those of a national prosecution machine. While federal use of centralized criminal prosecutorial powers has been rare, the dangers are sufficient to give us pause before sanctioning its expansion. But the commission we have before us presents this problem only obliquely. There is no occasion for courts to check an abuse of power here for there is none. No statute prevents central control of Strike Forces prosecuting organized crime. In view of the net of bureaucratic controls already binding the Strike Force, we face only a problem of the form of paperwork involved in assigning Strike Force attorneys. That work was, when the bureaucratic limits and guidelines governing this Strike Force attorney are read into his commis-

sion, sufficiently precise to meet the Congressional mandate of a specific direction required by 28 U.S.C. § 515(a).

 The decision of the court below holding appellant in contempt must be affirmed. The Department of Justice Organized Crime Strike Force attorney was lawfully authorized to appear before the grand jury that called appellant. The government sufficiently rebutted the suggestion that unlawful electronic surveillance may have occurred.

Affirmed.

### APPENDIX

### OFFICE OF THE ATTORNEY GENERAL

### WASHINGTON, D.C.

### ORDER No. 431–70

ESTABLISHING GUIDELINES GOVERNING INTERRELATIONSHIPS BETWEEN STRIKE FORCES AND UNITED STATES ATTORNEYS' OFFICES

By virtue of the authority vested in me by Sections 509 and 510 and Chapter 35 of Title 28 and Section 301 of Title 5 of the United States Code, I hereby direct that:

The appended "Guidelines Governing Interrelationships Between Strike Forces and United States Attorneys' Offices" shall henceforth govern the interrelationships between the Strike Forces operating under the Organized Crime and Racketeering Section of the Criminal Division and the Offices of the United States Attorneys for the districts in which such Strike Forces are located.

Dated: 4/20/70

(signed) JOHN N. MITCHELL
Attorney General

GUIDELINES GOVERNING INTERRELATIONSHIPS BETWEEN STRIKE FORCES AND UNITED STATES ATTORNEYS' OFFICES

### I. *Purpose*

Organized crime is a serious national problem requiring a special concentration and coordination of Federal investigative and prosecutive activities in geographic areas where the problem is most severe. In such areas, direction of the Federal efforts against organized crime is assigned to Strike Forces operating under the Organized Crime and Racketeering Section of the Criminal Division of the Department of Justice. These guidelines are designed to clarify the division of responsibilities and to govern the interrelationship between the Strike Forces and the United States Attorneys' offices. Since it is extremely important that the Government present a unified front against organized crime, the existence and importance of this division of responsibilities and the necessity of complete cooperation must be recognized by all personnel in both the Strike Forces and the United States Attorneys' offices.

\* \* \* \* \* \*

### III. *General Responsibilities*

The Strike Force assigned to a particular geographic area by the Organized Crime and Racketeering Section of the Criminal Division of the Department of Justice shall be responsible for supervising all Federal investigations of organized crime matters within such area, and for coordinating such investigations with state and local efforts against organized crime. The Chief of the Strike Force and the United States Attorney in such area shall have the responsibility of keeping each other fully advised of all organized criminal matters in progress. Where the area assigned to the Strike Force encompasses more than one judicial district, the Chief of the Strike Force shall work under these guidelines with each United States Attorney having jurisdiction of a portion of such assigned area.

### IV. *Personnel*

The Strike Force shall remain for all administrative and personnel purposes within the Organized Crime and Racketeering Section of the Criminal Division of the Department of Justice and the United States Attorneys' Office for all administrative and personnel purposes shall remain as now constituted. An at-

torney shall be appointed as Chief of each Strike Force by the Assistant Attorney General in charge of the Criminal Division with the advice of the United States Attorney of the district where the Strike Force is located.

## V. Investigative Matters

The Federal investigative agencies operating within the judicial district shall submit to the United States Attorney all cases concerning violations of Federal law except those concerning an organized crime subject or activity. Where a case clearly concerns an organized crime subject or activity, the investigative agency, including the Tax Division of the Department of Justice,* shall submit the matter in the first instance to the Strike Force. In the event that either the United States Attorney's Office or the Strike Force receives an investigative report of a matter of primary concern to the other, a prompt referral shall be made so that the case may proceed without delay.

In the case of a difference of opinion between the United States Attorney and the Chief of the Strike Force as to the assignment of an investigative matter, the United States Attorney shall make the initial assignment, but the Chief of the Strike Force may refer the matter to the Criminal Division of the Department of Justice which will review the decision of the United States Attorney and thereafter make a determination which shall be final. All concerned investigative agencies shall be advised of the assignment made with regard to an investigative matter.

The chain of command for pre-indictment investigative efforts within the field of organized crime shall be from the Attorney General to the Assistant Attorney General, Criminal Division, to the Chief of the Strike Force, to the investigatory personnel assigned to the Strike Force. Each United States Attorney shall be kept fully advised of organized crime developments within his district. When a specific investigation has progressed to the point where there is to be a presentation for an indictment, the Chief of the Strike Force shall then for this purpose operate under the direction of the United States Attorney who shall oversee the judicial phase of the development of the case. The matter shall be handled by attorneys assigned to the Strike Force unless the Chief of the Strike Force requests assignment to the Assistant United States Attorney. Where it is necessary in the judgment of the United States Attorney for the Government to be represented by two or more attorneys, at least one shall be a Strike Force attorney and one shall be an Assistant United States Attorney.

Where practicable, arrest warrants and search warrants sought in connection with a matter assigned to the Strike Force shall be sought with the concurrence of the United States Attorney.

## VI. Requests for Authorization for Electronic Surveillance Applications

Requests to the Criminal Division of the Department of Justice for authorization to apply to a Court for an electronic surveillance order pursuant to Chapter 119 of Title 18 of the United States Code (Title III of Public Law 90–351, June 19, 1968), in the course of an investigation assigned to the Strike Force, shall be made by the Chief of the Strike Force with the concurrence of the United States Attorney. If the United States Attorney concurs in the request initiated by the Chief of the Strike Force, the request shall be forwarded to the Criminal Division of the Department of Justice for a final decision as to whether the request should be submitted to the Attorney General for his approval. If the United States Attorney does not concur in the request of the Chief of the Strike Force, he shall advise the Chief of the Strike Force of his reasons for not concurring. The Chief of the Strike Force, upon receipt of the United States Attorney's reasons for not concurring, may elect either to accede to the views of the United States Attorney or to sub-

---

* Supervisory jurisdiction of such cases will remain in the Tax Division.

mit the question to the Criminal Division which shall review the matter and make a final decision as to whether the request should be submitted to the Attorney General for his approval.

A Strike Force attorney whose request for an electronic surveillance application has been approved by the Attorney General shall be authorized to present the application to the appropriate court. The Strike Force attorney shall advise the United States Attorney when the application will be presented to the court in order that the United States Attorney may be present if he so desires.

VII. *Authorizations to Proceed with Prosecutions*

Where the Chief of the Strike Force concludes that indictment is warranted on a matter assigned to the Strike Force, he shall set forth his recommendation in a prosecution memorandum to the United States Attorney. If the United States Attorney agrees with the recommendation, the matter shall be submitted to the Criminal Division of the Department of Justice for review prior to indictment. If the United States Attorney disagrees with the recommendation, he shall advise the Chief of the Strike Force of his reasons for disagreement. The Chief of the Strike Force, upon receipt of the United States Attorney's reasons for disagreement, may elect either to accede to the views of the United States Attorney or to submit the question to the Criminal Division of the Department of Justice which shall review the matter and make a determination which shall be final.

All indictments and informations shall be signed by the United States Attorney.

After indictment, any reduction of charges or other negotiated concessions to a defendant in an organized crime case must be approved by the Assistant Attorney General, Criminal Division.

VIII. *Litigation*

The chain of command in all litigation shall be from the Attorney General to the Assistant Attorney General, Criminal Division, to the United States Attorney, to the Chief of the Strike Force. The United States Attorney's responsibility in this area is personal and is not to be delegated to anyone other than the Strike Force Chief. The composition and duties of the litigation team shall be the joint responsibility of the United States Attorney and the Chief of the Strike Force.

All Strike Force attorneys shall be appointed as Special Attorneys by the Deputy Attorney General, as provided by 28 U.S.C. [§] 543 and regulations issued pursuant thereto, and shall be accorded all the rights and privileges provided in the letters of authorization issued by the Deputy Attorney General of the United States.

The United States Attorney shall compile, supervise, and dispose of all court calendar listings of Strike Force cases, including hearings, arraignments, trials, sentences, arguments, convenings of the grand jury, and any special proceedings or hearings otherwise directed by the court. The United States Attorney shall consult with the Chief of the Strike Force for the purpose of assigning appropriate priority in the scheduling of such Strike Force cases as are mutually agreed upon between them.

In all Strike Force cases, documents which are to be filed with a clerk of a court, with a court, or with a United States Magistrate or Commissioner—including subpoenas, briefs, motions, legal memoranda, points for charge, stipulations, and petitions—shall be signed by both the United States Attorney and a Strike Force attorney in the following manner:

(Signature) _ _ _ _ _ _ _ _ _ _ _ _ _

JOHN DOE
United States Attorney

(Signature) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

RICHARD ROE
Special Attorney

### IX. *Files and Exhibits*

The principal files and exhibits involving Strike Force matters shall be maintained by the Strike Force in its offices. The function of maintaining traditional status cards, mark-sense cards, and cards on organized crime cases, shall remain with the United States Attorney. The United States Attorney and the Chief of the Strike Force shall adopt appropriate administrative procedures to maintain records of organized crime matters in keeping with normal Department of Justice practices applicable to matters other than organized crime matters.

### X. *Sentence Recommendations*

If the Chief of a Strike Force believes that a recommendation should be made to a court in regard to a sentence for an organized crime offender, he shall submit his views in a memorandum to the United States Attorney. If the United States Attorney disagrees with those views, he shall advise the Chief of the Strike Force of his reasons for disagreement. The Chief of the Strike Force, upon receipt of the United States Attorney's reasons for disagreement, may elect either to accede to the views of the United States Attorney or to submit the question to the Criminal Division of the Department of Justice which shall review the matter and make a determination which shall be final.

### XI. *Publicity Releases and Public Statements*

Because the efforts against organized crime are national in scope and require national support, and because premature publicity releases or public statements can severely damage enforcement efforts, all publicity releases and public statements on the subject of organized crime by persons assigned to the Strike Force shall first be submitted for clearance to the Office of Public Information of the Department of Justice and shall in all respects conform to the requirements of 28 C.F.R. 50.2. In these matters, as in other matters involving public relations, the United States Attorney shall act as the principal representative of the Department of Justice in his district, and publicity releases authorized by the Office of Public Information to be issued locally shall generally be issued in the name of the United States Attorney. The Office of Public Information is directed to make special effort to give appropriate credit in approved releases to the individuals or agencies involved, and to conduct its duties in such a way as to build maximum public support for the entire organized crime effort.

### XII. *Supplementary Guidelines*

Supplementary guidelines which are not inconsistent with those contained herein may be adopted in any district upon the mutual agreement of the Chief of the Strike Force and the United States Attorney.