540 F.2d 995
 UNITED STATES of America, Plaintiff-Appellee,
v.
Robert Lee PRUEITT, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Karl Darrell PETERSEN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Neil Lee TEMPLE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Phillipp Michael BOURCHIER, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Dwayne David WALKER, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Darla Loree BLICKENSTAFF, a/k/a Darla Loree Jenkins,
Defendant-Appellant.
 Nos. 75-2709, 75-2601, 75-2602, 75-2599, 75-2603 and 75-2600.
 United States Court of Appeals,
Ninth Circuit.
 July 21, 1976.
Rehearing and Rehearing En Banc Denied Sept. 7, 1976.
 
 Stephen J. Dimeff (argued), San Diego, Cal., for appellant in 75-2599, 75-2600 and 75-2602.
 Frank T. Vecchione (argued), Fed. Defenders of San Diego, Inc., San Diego, Cal., for appellant in 75-2601.
 Victor Sherman (argued), of Nasatir, Sherman & Hirsch, Beverly Hills, Cal., for appellant in 75-2603 and 75-2709.
 James W. Brannigan, Jr. (argued), Dept. of Justice, Washington, D.C., for appellee.
 OPINION
 Before CHAMBERS, BARNES and HUFSTEDLER, Circuit Judges.
 BARNES, Senior Circuit Judge:
 
 I Facts
 
 1
 On approximately September 1, 1974, a previously untested informant approached Los Angeles County Deputy Sheriff William B. Stoops, informing him that Defendants Jerry Hong and Robert Prueitt were both pilots, that Prueitt owned an airplane, that Hong would fly Prueitt's aircraft and Prueitt would fly another airplane, that both would fly to some location in the desert near Apply Valley, California, where they would meet some camper vehicles with other people. There, according to the informant, Hong and Prueitt would meet certain persons arriving by auto, and would take the seats out of the airplanes, line the inside with plastic material and install extra gas tanks. Then, the following morning, Hong and Prueitt would fly the airplanes to Mexico, leaving sometime prior to dawn, and return within approximately sixteen hours with marijuana which would be unloaded into the campers. The seats would then be placed back into the airplanes and the planes flown back to the El Monte Airport. Deputy Stoops requested the informant to contact him when such a trip was planned.
 
 
 2
 On October 1, 1974, the informant called Stoops, relating that the above scheme would take place beginning that same day at 4:00 p. m. when Hong and Prueitt were to leave from the El Monte Airport. Stoops then contacted the Drug Enforcement Administration (DEA) and related all the information he had received from the informant first to Agent Roberts and later that day to Agent Sye. Upon receipt of this information, Sye and fellow agents commenced surveillance of Prueitt's airplane. At 5:30 p. m., Prueitt's plane, occupied by both Hong and Prueitt, and under air surveillance, departed from the El Monte Airport and flew to Brackett Airport in La Verne, California, about twenty miles away. Several minutes later, it taxied back onto the runway and requested take-off clearance. A second aircraft, which had been parked beside Prueitt's plane also requested the same clearance and departure time. When both aircraft were airborne, Agent Sye monitored conversations between the pilots, noting that the parties were referring to one another as "Jerry" and "Bob" (the first names of Defendants Hong and Prueitt). At approximately 6:30 p. m., both aircraft landed at an abandoned Navy dirt airstrip located in the desert. The planes were met by a pickup camper and a station wagon with a trailer attached. Sye, who had observed the above activity in a DEA airplane piloted by Agent Hindes, left the area at dark, at which time the two ground vehicles and two airplanes were parked together on the airstrip.
 
 
 3
 Shortly before dawn on October 2, 1974, Sye and Hindes returned to the airstrip in the DEA airplane, finding that the ground vehicles were still there, but that the airplanes had departed. They returned to the area around noon, observing that the ground vehicles also had departed. Later that day, both ground vehicles were seen together in the same general area and later, at the airstrip. Shortly after 5:00 p. m., both vehicles had stationed themselves. The camper had proceeded to Galway Dry Lake, while the station wagon-trailer was parked at the airstrip. The DEA airplane containing Agent Sye shuttled between Galway Dry Lake and the airstrip, keeping both vehicles under surveillance while ground units moved into the area. Just prior to 5:15 p. m., one of the airplanes landed at the airstrip and met the station wagon-trailer. In less than twenty minutes, the aircraft and ground vehicle had separated, the airplane taking off to the west and the ground vehicle leaving the airstrip. After Agent Sye identified the airplane as one of the planes which he had observed the previous day, he instructed Agent Shaw by radio to stop and search the station wagon-trailer. Upon stopping the vehicle which Defendant Bourchier was driving as its sole occupant, Shaw looked in the trailer from outside. He saw several full burlap bags and some gas cans. He thereupon searched the vehicle and found ten bags of a substance which appeared to be marijuana and nine empty gas cans. The results of the stop and search were transmitted to Agent Sye, who arrested Defendants Hong and Neil Lee Temple when they landed at the El Monte Airport.
 
 
 4
 While the arrests of the occupants of the station wagon-trailer and the aircraft were occurring, the camper was still waiting at Galway Dry Lake under the surveillance of Agent Gribble. As it became dark, Agent Gribble radioed to Agent Roberts that an airplane was circling over the camper and the camper was flashing its headlights, but that he could not determine whether or not the airplane had landed. While Roberts and others were proceeding toward Galway Dry Lake in response to Gribble's prior transmission, Gribble radioed that the camper was leaving and heading toward them. Roberts and the others then established a roadblock. When the camper approached, the agents activated a red light and siren. The camper, however, did not stop, but rather attempted to run through the roadblock. A warning shot brought the vehicle to a stop. The occupants of the camper were Defendant Walker, the driver, and Defendant Jenkins. In the vehicle, the agents found a fully automatic carbine, four airplane seats that came from one of the planes, and a number of red gas cans.
 
 
 5
 Since the other airplane had not been located yet, Deputy Stoops and his partner, Deputy Lopez, drove to Soggy Dry Lake where it appeared that the camper had been heading before it was stopped. Upon arriving at the Lake, they heard an airplane. The officers flashed the headlights of their vehicle as the camper had previously done. An airplane landed and taxied toward them. After the plane's engine had been shut off, Deputy Stoops alighted from his vehicle with gun drawn and ordered the Defendants in the plane, Defendants Prueitt and Petersen, to exit. Other agents were notified, and Agent Roberts arrived shortly thereafter. Roberts proceeded to search the plane, during which he found seven burlap bags full of marijuana and seven red fuel cans. A fuel system identical to the one found in the station wagon-trailer was also discovered during the search. An air chart of the Northern Gulf of California area of Mexico was also found with a hand-marked course line showing it was intended for use in navigating by plane from the area of Imperial, California, to Los Mochis Sinaloa, Mexico, and back to the Soggy Dry Lake area. In both airplanes, agents found as well identical Los Angeles and San Diego sectional air charts with identical handwritten notations indicating that they were intended for use in flying to the Soggy Dry Lake area. The marijuana recovered was packaged in traditional Mexican packaging. The auxiliary fuel systems were necessary to extend the range of the two airplanes to reach Los Mochis.
 
 II Conviction and Sentence
 
 6
 All Defendants were indicted in the Southern District of California on three counts. The first count charged them with unlawfully, willfully, and knowingly combining, conspiring, confederating, and agreeing together, and with each other, to commit offenses in violation of 21 U.S.C. 841(a)(1), 952, and 960. The second count charged the Defendants with knowingly and intentionally importing approximately 900 pounds of marijuana into the United States from Mexico. The third count charged them with knowingly and intentionally possessing with intent to distribute approximately 900 pounds of marijuana. In a trial without jury, the Defendants were all acquitted as to counts two and three, but were found guilty as to count one. On appeal, Defendants contend that their convictions as to count one should be reversed. This Court has jurisdiction under 28 U.S.C. 1291.
 
 
 7
 III "Authorized Attorney for Government"
 
 
 8
 The first issue which appellants raise is that the indictment in the present case was not obtained by an authorized attorney for the government as is required by statute, and was, therefore, void. The relevant statutes here are 28 U.S.C. 547, 28 U.S.C. 515(a), and Federal Rules of Criminal Procedure 6(d) and 54(c). The duties of the United States Attorney are contained in 28 U.S.C. 547, which provides in part:
 
 
 9
 Except as otherwise provided by law, each United States attorney, within his district, shall
 
 
 10
 (1) prosecute for all offenses against the United States;
 
 
 11
 (2) prosecute or defend, for the Government, all civil actions, suits or proceedings in which the United States is concerned;
 
 
 12
 As defined by Federal Rules of Criminal Procedure 6(d), only "(a)ttorneys for the government . . . may be present while the grand jury is in session . . . ." Rule 54(c) states that an " 'Attorney for the government' means the Attorney General, an authorized assistant of the Attorney General, a United States Attorney, (and) an authorized assistant of a United States Attorney . . . ."
 
 
 13
 The indictment in the present case was obtained by James W. Brannigan, Jr., who is an attorney for the Department of Justice, Narcotic and Dangerous Drug Section. In order for Mr. Brannigan to have validly procured the indictment, it is clear that he must have been an "attorney for the government" within Federal Rules of Criminal Procedure 6(d). The government contends that Brannigan has this authority by virtue of 28 U.S.C. 515(a), which states:
 
 
 14
 The Attorney General or any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrates, which United States attorneys are authorized by law to conduct, whether or not he is a resident of the district in which the proceeding is brought. (emphasis added).
 
 
 15
 Thus, it is clear that for Brannigan to have been an attorney for the government here, two requirements must have been satisfied. First, he must have been "specially appointed by the Attorney General." Second, he must have been "specifically directed by the Attorney General (to) conduct any kind of legal proceedings, civil or criminal, including grand jury proceedings." (emphasis added).
 
 
 16
 The government argues that the above requirements were satisfied when Deputy Attorney General Richard Kleindienst issued a letter of authorization to Brannigan. It is unclear whether this authorization was actually signed by Mr. Kleindienst or was issued by way of a "stamp" representing his signature. The letter provided in pertinent part:
 
 
 17
 As an attorney and counselor at law you are hereby specially retained and appointed as a Special Attorney under the authority of the Department of Justice to assist in the trial of the case or cases growing out of the transactions hereinafter mentioned in which the Government is interested. In that connection you are specifically directed to file informations and to conduct in the Southern District of California and in any other judicial district where the jurisdiction thereof lies any kind of legal proceeding, civil or criminal, including grand jury proceedings, and proceedings before committing magistrates, which United States Attorneys are authorized by law to conduct.
 
 
 18
 The department is informed that various persons, companies, corporations, firms, associations, and organizations to the Department unknown have violated in the above-named district and in other judicial districts the Controlled Substances Act and the Controlled Substances Import and Export Act (21 U.S.C. 801-966) and other criminal laws of the United States and have conspired to commit all such offenses in violation of Section 371 of Title 18 of the United States Code. (emphasis added).
 
 
 19
 We note that the authorization letter was issued by the Deputy Attorney General rather than the Attorney General. The issue is not raised that the Attorney General is without authority to delegate his power to assign government attorneys. Even if it were raised, however, such a contention would be without merit. Section 515(a) imposes no limitation on the Attorney General's authority to delegate his power of appointment to other officers within the Department of Justice. See United States v. Crispino, 392 F.Supp. 764, 766-67 (S.D.N.Y.1975). But note Reversed by an unpublished opinion 517 F.2d 1395 (2d Cir., 1975). Furthermore, Section 510 of Title 28 permits the Attorney General to delegate any of his functions to "any other officer" of the Department of Justice. See In Re Subpoena of Persico, 522 F.2d 41, 66-67 (2d Cir. 1975). By regulation, 28 C.F.R. 0.15(b)(3), the Deputy Attorney General shall "(e)xercise the power and authority vested in the Attorney General . . . to take final action in matters pertaining to . . . : (ii) the appointment of . . . other attorneys to assist U.S. Attorneys when the public interest so requires . . . ." We, therefore, conclude that Deputy Attorney General Kleindienst had the authority, under 28 U.S.C. 515(a), to issue the authorization letter to Mr. Brannigan.
 
 
 20
 The validity of the authorization letter here at issue is not a novel question in the federal courts.[1] As stated above, in order for Brannigan to have been an attorney authorized to appear before a grand jury, the government must have satisfied two requirements: (1) Brannigan must have been specially appointed by the Attorney General or the Deputy Attorney General, and (2) he must have been specifically directed by the (Deputy) Attorney General to conduct grand jury proceedings. In confronting this very question, the Second Circuit noted that "(a)lmost every case which has interpreted 28 U.S.C. Sec. 515(a) favors the government." In Re Subpoena of Persico, supra, 522 F.2d at 61.
 
 
 21
 When determining whether such broad authorization letters as here in question satisfy the above two requirements, the courts have had little difficulty in holding that the first requirement is satisfied. See, e. g., United States v. Weiner, 392 F.Supp. 81, 86 (N.D.Ill.1975); United States v. Brown, 389 F.Supp. 959, 960 (S.D.N.Y.1975). In fact, some courts have assumed, without discussion, that the "specially appointed" requirement has been satisfied by the authorization letter. See, e. g., United States v. Di Girlomo, 393 F.Supp. 997, 1004-05 (W.D.Mo.1975); United States v. Brodson, 390 F.Supp. 774, 783 (E.D.Wis.1975). Here, the letter provided that Brannigan was "specially retained and appointed as a Special Attorney under the authority of the Department of Justice . . . ." We believe that this language satisfies the "any attorney specially appointed by the Attorney General under law" requirement law" requirement of Section 515(a).
 
 
 22
 The more serious and complex question is whether Brannigan, within the meaning of Section 515(a), was "specifically directed by the Attorney General" to present this case to the grand jury. The majority of courts, which have considered whether broad authorization letters such as here satisfy the "specifically directed" requirement, have held that such letters comply with the statute. There is, however, a minority view, holding that such broad letters do not fulfill the requirements of the statute. This minority view is represented by a district court's ruling in United States v. Crispino, 392 F.Supp. 764, 779-81 (S.D.N.Y.), rev'd, 517 F.2d 1395 (2nd Cir. 1975), where the district court stated:
 
 
 23
 "Undoubtedly, the Attorney General of the United States has a serious and difficult responsibility in combating 'organized crime.' If he feels that the local United States Attorneys and their regular assistants cannot be as effective in the prosecution of 'organized crime' cases as special attorneys, then he should be able to appoint special attorneys with particular knowledge and skill to prosecute those cases and present them to the grand jury. That is precisely why Congress passed what is now Section 515(a). But that power is limited to such specialized areas as cases against 'organized crime' and was never meant to extend to the prosecution of any case which involved a violation of 'a federal criminal statute.' If the Attorney General felt that the commissions to his special attorneys would be unduly restrictive if they were limited to 'organized crime cases' or 'Lands Division cases,' etc., then he should have asked Congress to amend section 515(a). He has no authority to issue a broad roving commission such as the one given to Mr. Padgett with its complete lack of any specific direction." (footnotes omitted).
 
 
 24
 See United States v. Wrigley, 392 F.Supp. 9, 12-13 (W.D.Mo.1975).
 
 
 25
 Contrary to the district court's decision in Crispino, the majority of courts have upheld broad letters of authorization. In fact, some courts have stated that the "specifically directed" requirement is primarily for the protection of the United States. See Shushan v. United States, 117 F.2d 110, 114 (5th Cir.), cert. denied, 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531, reh. denied, 314 U.S. 706, 62 S.Ct. 53, 86 L.Ed. 564 (1941); United States v. Powell, 81 F.Supp. 288, 291 (E.D.Mo.1948). In rejecting the district court's rationale in Crispino, the Second Circuit recently asserted: "The 'specifically directed' phrase in Section 515(a) should not be so niggardly construed as to interfere with the federal government's ability to efficiently administer its criminal laws." In Re Subpoena of Persico, supra, 522 F.2d at 64. The Second Circuit emphasized that the statute must be interpreted in a common-sense and pragmatic manner. Id. at 64-65. A recent decision of this Circuit is in agreement with the Second Circuit's approach. See United States v. Zuber, 528 F.2d 981, 982 (9th Cir. 1976). In addition, several district courts have held that "Congress has by vesting the Attorney General with the power and responsibility over the enforcement of the criminal laws of the United States, evidenced an intent to empower him to make the broad Section 515 appointments of the type here challenged." United States v. Di Girlomo, 393 F.Supp. 997, 1006 (W.D.Mo.1975); Accord, In Re Di Piero, 394 F.Supp. 1350, 1353 (E.D.Pa.1975); United States v. Badalamenti, 394 F.Supp. 807, 815 (D.N.J.1975); United States v. Weiner, 392 F.Supp. 81, 88 (N.D.Ill.1975); United States v. Brodson, 390 F.Supp. 774, 783 (E.D.Wis.1975); United States v. Brown, 389 F.Supp. 959, 963 (S.D.N.Y.1975). Or, as stated by the district court in Badalamenti, supra, 394 F.Supp. at 815: "As the legislative history indicates, the Congress in enacting the statute which has now become Sec. 515(a) was attempting to expand the authority of the Attorney General to comprehensively and effectively combat crime and to make certain that the Attorney General and those under his direction were empowered to conduct any criminal or civil proceedings which United States Attorneys were authorized to conduct."
 
 
 26
 As the courts espousing the majority view recognize, the philosophy and methods of law enforcement have changed in recent years. See United States v. Badalamenti, supra, 394 F.Supp. at 815-17. The concept of appointing a Special Attorney for a particular case (see, e. g., United States v. Amazon Industrial Chemical Corporation, 55 F.2d 254 (D.Md.1931); United States v. Huston, 28 F.2d 451 (N.D.Ohio 1928); United States v. Morse, 292 F. 273 (S.D.N.Y.1922)), is no longer viable in attempting to battle the preponderance of organized crime and lawlessness within our society. See United States v. Brown, supra, 389 F.Supp. at 961.
 
 
 27
 Unlike many of the recently decided cases discussed above, here Mr. Brannigan was not a member of the Strike Force but rather an attorney for the Narcotic and Dangerous Drug Section of the Department of Justice. His duties, however, were similar to a Strike Force attorney and his letter of authorization was practically identical. Brannigan's letter, although general for the most part, specifically mentions the Controlled Substances Act and the Controlled Substances Import and Export Act. The implication of this language is that Brannigan would prosecute those individuals who violated the above acts. As such, his duties encompassed combating and eradicating the danger of organized crime. We, therefore, in this case decline to distinguish the duties assigned to Brannigan from those of a Strike Force attorney.
 
 
 28
 In interpreting Section 515(a) in view of present day realities, we hold that the issuance of the letter of authorization in this case satisfied the "specifically directed" requirement of the statute. In arriving at this conclusion, we are guided by our answers to three basic questions: (1) What constitutional rights were the appellants denied by Mr. Brannigan's presence before the grand jury? (2) What disadvantage did the appellants suffer due to Mr. Brannigan's appearance? (3) Would not the appellants be situated in the identical position had the local United States Attorney secured the indictment before the grand jury? Our prior discussion clearly indicates that appellants' argument is based on form rather than substance. See United States v. Weiner, 392 F.Supp. 81, 89 (N.D.Ill.1975). Mr. Brannigan's authority "to execute his oath of office should not depend upon what type of form letter his superior uses in appointing him." Id. Since Section 515(a) does not confine its application to particular types of cases or defendants, this Court believes that it is appropriate to construe the statute in such a manner so as to implement the public policies for which it was enacted. Such an appropriate construction is to uphold the broad grant of authority given to Brannigan here. A contrary result would not only be against the impressive weight of authority but would also be deleterious to the current needs of law enforcement. We, therefore, conclude that the indictment in the present case was obtained by "an authorized attorney for the government," as is required by statute.
 
 IV Disclosure of Informant's Identity
 
 29
 Appellants' second contention is that the district court erred in refusing to order disclosure of the informant and in limiting cross-examination on that subject. In determining whether the District Judge ruled properly, we note that "the government's privilege to withhold an informer's identity must give way where his identity is 'relevant and helpful to the defense of the accused, or is essential to a fair determination' of his case." United States v. Kelly, 449 F.2d 329, 330 (9th Cir. 1971), citing, Roviaro v. United States, 353 U.S. 53, 60-61, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). However, "(m)ere speculation that the informer might possibly be of some assistance is not sufficient to overcome the public interest in the protection of the informer." Lannom v. United States, 381 F.2d 858, 861 (9th Cir. 1967) cert. denied, 389 U.S. 1041, 88 S.Ct. 784, 19 L.Ed.2d 833 (1968). In attempting to balance the government's interest in nondisclosure against the defendant's interest in preparing his case, our most recent decisions have placed the burden upon the accused to show the need for disclosure. See United States v. Kelly, supra, 449 F.2d at 330; United States v. Estrada, 441 F.2d 873, 879 (9th Cir. 1971); Gaylor v. United States, 426 F.2d 233, 234-35 (9th Cir. 1970). Applying these principles to the facts before us, we observe that the appellants have shown no real need for disclosure of the informant which would override the government's interest in protecting him as a source of information. Defendants merely speculate that the informant's testimony may have been helpful to their defense. Such speculation is not sufficient to require disclosure.[2] The District Judge therefore did not abuse his discretion in refusing to order the informant's disclosure and in limiting cross-examination on that subject.
 
 V Motions to Suppress
 
 30
 Appellants' third contention is that their motions to suppress the evidence seized from their vehicles were improperly denied. In considering this contention, we must first determine whether the defendants here have standing to contest these searches and seizures. Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), establishes the applicable guidelines:
 
 
 31
 (T)here is no standing to contest a search and seizure where, as here, the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure.
 
 
 32
 Id. at 229, 93 S.Ct. at 1569; see United States v. Kahan, 415 U.S. 239, 242, 94 S.Ct. 1179, 39 L.Ed.2d 297 (1974); United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); United States v. Colacurcio, 499 F.2d 1401, 1406 (9th Cir. 1974); United States v. Ramirez, 480 F.2d 76, 79 (9th Cir. 1973).
 
 
 33
 Because appellants were acquitted as to counts two and three of the indictment, our determination on this issue is limited to whether appellants have standing under count one to contest the searches and seizures. United States v. Boston, 510 F.2d 35, 37 (9th Cir. 1974), cert. denied, 421 U.S. 990, 95 S.Ct. 1994, 44 L.Ed.2d 480 (1975). We note that count one does not charge appellants with possession of the seized evidence as an essential element of the offense charged, but rather with conspiring to commit certain offenses. Because possession is not a crucial element here, "(t)he vice of allowing the Government to allege possession as part of the crime charged, and yet deny that there was possession sufficient for standing purposes, is not present." Brown v. United States, supra, 411 U.S. at 229, 93 S.Ct. at 1569.[3] Therefore, appellants do not have automatic standing under Brown since "possession at the time of the search is not an essential element of the crime charged." United States v. Boston, supra, 510 F.2d at 38.
 
 
 34
 To have standing to contest the searches and seizures here in question, the appellants must therefore demonstrate actual standing. This could have been accomplished by the appellants' asserting during their motion to suppress a proprietary interest in the premises searched or a possessory interest in the articles seized. See Brown v. United States, supra, 411 U.S. at 229, 93 S.Ct. 1565. If the appellants had made such an assertion, it is clear that such a statement could not thereafter be admitted against them at trial on the question of guilt unless they had made no objection. Simmons v. United States, 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). This showing in support of actual standing must be established by the appellants, and is not to be assumed. As this Court stated in United States v. Boston, supra, 510 F.2d at 38:
 
 
 35
 We now know the truth to be that appellant at the time of seizure did in fact claim as his the heroin seized. It was on that basis that he was convicted. But truth as it emerges from trial cannot reach backward to confer standing to move to suppress. Rather it is the showing made by the defendant at the time he moves to suppress that counts. He must then show that at the time of seizure he had a possessory interest in that which he seeks to suppress. Should he, in support of a motion to suppress, concede such an interest in order to establish "actual standing," his concession, as we have noted, cannot now be used against him at trial. . . . But it is a concession that must be made. Neither jury verdict nor governmental contention can serve to relieve the defendant of his burden in those cases where automatic standing does not serve to relieve him.
 
 
 36
 The record indicates that only one defendant, Robert Lee Prueitt, asserted a possessory interest over the evidence seized at the motion to suppress (R.T. 226). Later, Prueitt filed an affidavit that "at the time of seizure of the marijuana that I had a possessory interest in said marijuana and dominion and control over the same." (C.T. 171-72). The other defendants failed to allege a possessory interest in that which they sought to suppress. It was imperative that this concession be made. By failing to meet this burden, all defendants except Prueitt do not have actual standing.
 
 
 37
 Prueitt contends that the searches and seizures here were without probable cause and, therefore, such evidence seized should have been suppressed. We note that although the informant in this case was previously untested, the law is clear that an informant's reliability can be verified on reasons other than past reliability. See Spinelli v. United States, 393 U.S. 410, 417-18, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Such grounds include the reasonableness of the informant's access to accurate information regarding the suspect, independent corroboration of the informant's tip, and independent investigation including the probability, apart from the informant's tip, that the suspect possessed contraband. See Spinelli v. United States, supra, 393 U.S. at 417, 89 S.Ct. 584; United States v. Smith, 503 F.2d 1037, 1039-40 (9th Cir. 1974), cert. denied, 419 U.S. 1124, 95 S.Ct. 810, 42 L.Ed.2d 825 (1975).
 
 
 38
 In determining whether to uphold the initial search and seizure, that of the station wagon-trailer, we find that the law enforcement officers had verified substantially everything that the informant had related except the presence of the contraband and the preparation of the airplanes (e. g., removal of seats and installation of extra gas tanks) and their actual flights to Mexico. "This verification of the informer's story provided a 'substantial basis' for concluding that the informer was reliable." United States v. Archuleta, 446 F.2d 518, 519-20 (9th Cir. 1971); see Gilbert v. United States, 366 F.2d 923, 931 (9th Cir. 1966). Although it is true that the tip did not include the underlying circumstances from which the informant concluded that the criminal conduct would occur, the predicted conduct "was described in such detail, however, that a magistrate would have been justified in concluding that the informer had obtained his information in a reliable manner." United States v. Archuleta, supra, 446 F.2d at 520; see Spinelli v. United States,supra, 393 U.S. at 417, 89 S.Ct. 584. We therefore conclude that the officers had probable cause to make the initial search and seizure here at issue.
 
 
 39
 We also note that Agent Sye's experience in having investigated similar cases for five years and, particularly this exact method of smuggling, augmented his probable cause. Thus, "the totality of the evidence, to an experienced border agent familiar with the methods employed by smugglers, did establish probable cause to believe (that the appellant's vehicle contained contraband)." United States v. Patterson, 492 F.2d 995, 997 (9th Cir. 1974).
 
 
 40
 Because the valid search of the station wagon-trailer revealed marijuana, the informant's information was independently corroborated and the agents then had probable cause to arrest the other suspects associated with the venture. The subsequent arrests and searches incident thereto were constitutionally permissible. See United States v. See, 505 F.2d 845, 855 (9th Cir. 1974), cert. denied, 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1975); United States v. Westover, 511 F.2d 1154, 1155-56 (9th Cir.), cert. denied, 422 U.S. 1009, 95 S.Ct. 2633, 45 L.Ed.2d 673 (1975). We therefore conclude that the District Judge properly denied the appellants' motions to suppress the evidence seized from their vehicles.
 
 VI Venue
 
 41
 Next, appellants contend that venue was improperly laid in the Southern District of California over the conspiracy count. "(T)he law is that an overt act committed in the course of a conspiracy which occurs in a district gives rise to jurisdiction to prosecute the conspirators in that district." United States v. Barnard, 490 F.2d 907, 910 (9th Cir. 1973), cert. denied,416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). Further, "venue need be proved only by a preponderance of the evidence, and can be established either directly or circumstantially." United States v. Powell, 498 F.2d 890, 891 (9th Cir.), cert. denied, 419 U.S. 866, 95 S.Ct. 121, 42 L.Ed.2d 103 (1974). In United States v. Trenary, 473 F.2d 680, 682 (9th Cir. 1973), this Court concluded that in determining whether venue was properly laid "(j)udicial notice may be taken of a map of the area and, considering the time factor, the distance covered, and the probable source of the marijuana . . . ."
 
 
 42
 Applying the above principles to the facts of this case, we hold that venue in the Southern District of California was established by a preponderance of the evidence. The maps, writing on the maps, course lines drawn on the maps, the printing on the sack, and the appearance of the packaging of the marijuana, sufficiently prove by reasonable inferences that there was an overflight over the Southern District which satisfies the venue requirements for this particular case. See United States v. Barnard, supra, 490 F.2d at 910-12; R.T. 319.
 
 VII Acquittal on Substantive Counts
 
 43
 Appellants' final argument is that the acquittals on the substantive counts require reversal of their convictions as to count one of the indictment which charged them with a conspiracy to import and possess marijuana with intent to distribute it. Contrary to appellants, we do not find the verdicts inconsistent. Although the government may have failed to meet its burden of proof in showing that the appellants were guilty of the substantive counts, it proved beyond a reasonable doubt that the appellants conspired and joined together in a venture to accomplish that which is illegal.
 
 
 44
 Having considered all issues which have been raised by appellants on appeal, the judgment of the District Court is AFFIRMED.
 
 HUFSTEDLER, Circuit Judge (dissenting):
 
 45
 Except for Petersen's appeal, this case should be remanded to the district court for the purpose of conducting an evidentiary hearing to answer these questions: (1) Did Deputy Attorney General Kleindienst sign the letter purporting to authorize Mr. Brannigan to present this case to the grand jury? (2) Did the Attorney General, or a person to whom he properly delegated authority, impose upon Mr. Brannigan's appointment the specific directions that are required by 28 U.S.C. § 515(a)? Appellants, other than Petersen, tried to ascertain the answers to these questions by moving for a bill of particulars,[1] and also moved to dismiss the indictment. Petersen has not attacked the indictment.
 
 
 46
 The district court abused its discretion in denying appellants' Rule 7(f) motion. The requested information was crucial to the appellants' attack on the validity of the indictment, and no justification existed for denying access to the information that the appellants sought. I agree with Judge Oliver's conclusion in United States v. Williams (W.D.Mo.1974) 65 F.R.D. 422, that a Rule 7(f) motion is the appropriate procedural vehicle for obtaining this information and with his observation that "if the power vested in the Attorney General by . . . Section 515(a), (1) has not been properly exercised by the Attorney General in regard particularly to (Mr. Brannigan), or (2) if that statute, properly construed, is not broad enough to authorize the action which the Attorney General has, in fact, attempted to take pursuant to its authority, either possibility should be recognized and determined at the earliest possible moment so that any administrative defects in regard to the Attorney General's present method of special appointment and specific direction of Special Attorneys be corrected or that additional congressional authorization be sought and obtained under the circumstances. (footnote omitted)" (65 F.R.D. at 428.)
 
 
 47
 On appeal, the Government defends the denial of the motions on the grounds that they "clearly sought a freewheeling fishing expedition through Government files in the outside hope that they might turn up some irregularity," and, in any event, appellants suffered no prejudice from the denial. Both arguments are frivolous. Appellants had a license to fish, if any fishing were involved. The questioned letter bore no indicia of authenticity. Deputy Attorney General Kleindienst's name was affixed by a rubber stamp. The appellants were entitled to know who stamped the letter and by what authority. The letter was dated some three years before this indictment was returned. If this letter was not authentic or was not issued pursuant to statutory authority, the indictment was void. The appellants were prejudiced by the denial of their motions by being thwarted from discovering the evidence that might have proved that the indictment was void.
 
 
 48
 Even if it had been proved that Deputy Attorney General Kleindienst himself stamped his name on the letter, or authorized another to do so, the letter does not contain within it the specific directions that Section 515(a) requires. The letter purports to authorize Mr. Brannigan indefinitely to conduct all kinds of criminal proceedings throughout the country, specifically including certain drug abuse offenses in the Southern District of California. Although Section 515(a) should not be given a cramped reading, neither should it be read as permitting Attorneys General to appoint roving Special Attorneys unmoored from the direct command of the Department of Justice, from any United States Attorney in his district, or from a Strike Force that is itself circumscribed by detailed guidelines and regulations.
 
 
 49
 The appointment letter contains no specific directions nor restrictions on Mr. Brannigan's authority. In this case, unlike In re Grand Jury Subpoena of Persico (2d Cir. 1975) 522 F.2d 41, the special prosecutor was not a Strike Force member. Nothing in this record, in contrast to Persico, suggests that Mr. Brannigan's letter authority is limited in any way by "other writings, guidelines, practices and oral directions transmitted through a chain of command within the (Justice) Department." (522 F.2d at 66.) If, on remand, evidence was produced showing that specific directions and restrictions were imposed on Mr. Brannigan's authority as they were on the Strike Force lawyers in Persico, the requirements of Section 515(a) would be met, and the indictment would be immune from attack. If those directions and restrictions are not thus evidenced, the authorization fails under Section 515(a) and brings down the indictment as well.[2]
 
 
 50
 Compliance with the specifications of Section 515(a) cannot be brushed aside as an idle formality. Congress was aware of fears of an uncontrolled federal prosecution force. The history of Section 515(a) demonstrates that "Congress did not wish to see the traditional primary role of the local district (now United States) attorney before the grand jury reduced unless there was some special reason made explicit by the Attorney General." (In re Subpoena of Persico, supra, 522 F.2d at 60.) Nor can the appearance of an unauthorized person before a grand jury be dismissed as a technicality. The authority to present cases to a federal grand jury carries with it solemn responsibilities both to the public and to persons who may be brought before it. The process can result in an indictment that throws the might of the Government against the individual, be he innocent or guilty. The conduct of the process is secret. Secrecy is designed to protect the process itself as well as to protect witnesses and the innocent accused. (United States v. Procter & Gamble Co. (1958) 356 U.S. 677, 681 & n. 6, 78 S.Ct. 983, 2 L.Ed.2d 1077.) The presence of an unauthorized person before the grand jury impairs secrecy. Because grand jury proceedings can be used to intimidate as well as to protect, their conduct is hedged with restrictions. One of those important restrictions is the requirement that only authorized persons are permitted to present cases to a grand jury. It is immaterial that a person who was indicted by a grand jury tainted by the presence of an unauthorized prosecutor would also have been indicted by the same grand jury free from that taint. The taint blights the process itself, and thus diminishes regard for the administration of justice. We can no more disregard this infirmity than we could dismiss as harmless an adjudication by a judge who was statutorily disqualified from hearing a case. In both instances, the stake is the integrity of the administration of justice, and the existence of prejudice to a defendant is irrelevant.
 
 
 51
 In addition to the indictment questions, I must reach the question whether the searches and seizures involving the stationwagon and the aircraft are legal because these issues are raised by Petersen. I have no occasion to discuss the remaining issues because they should abide the outcome of the evidentiary hearing on remand.
 
 
 52
 Contrary to the majority opinion, Petersen had automatic standing to challenge the validity of the searches under Brown v. United States (1973) 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208. Among the counts of the indictment against him, was a charge of possession of marihuana with intent to distribute it; he was thus "charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure." (Brown v. United States, supra, 411 U.S. at 229, 93 S.Ct. at 1569.)
 
 
 53
 The majority interprets "charged" to mean "convicted." That reading makes no sense as a matter of English or as a matter of law. Petersen's standing to make his pretrial motion to suppress was patent. United States v. Boston (9th Cir. 1975) 510 F.2d 35, from which the majority quotes, speaks against the idea that standing at the time of the motion to suppress can be affected by later events at trial. "(T)ruth as it emerges from trial cannot reach backward to confer standing to move to suppress. Rather it is the showing made by the defendant at the time he moves to suppress that counts." (Id. at 38.) The majority does not try to explain why "truth" cannot reach backwards to confer standing, but it can reach backwards to undo standing. I am unable to supply any explanation.
 
 
 54
 Jones v. United States (1960) 362 U.S. 257, 264, 80 S.Ct. 725, 733, 4 L.Ed.2d 697, teaches that standing based on the offense "charged" is determined by the face of the indictment: "In cases where the indictment itself charges possession, the defendant in a very real sense is revealed as a 'person aggrieved by an unlawful search and seizure' upon a motion to suppress evidence prior to trial." Moreover, if standing is predicated upon one count of the indictment that charges an offense that contains possession as an ingredient, the defendant's automatic standing permeates the remaining counts based on similar facts, even if none of them has a possession element. As the Court said in Jones: "(T)he Government should choose between opposing a motion to suppress made before trial (on standing grounds) and basing the case upon possession . . . ." (Id. at 265, n. 1, 80 S.Ct. at 733.) The Jones decision reversed the conviction on both the possessory and non-possessory counts.
 
 
 55
 Our holding in United States v. Boston, supra, 510 F.2d 35, that automatic standing permits the defendant to challenge only the possessory counts is wrong, based as it is on a misreading of both Jones and Brown v. United States, supra, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208.[3] However, Boston, right or wrong, does not support the majority's singular conclusion that an acquittal on the possession count altogether foreclosed Petersen's automatic standing.
 
 
 56
 Petersen's motion to suppress should have been granted because the search of the stationwagon was not supported by probable cause in that the corroboration of the reliability of the tip, especially concerning the stationwagon, was inadequate. (Spinelli v. United States (1969) 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637; Aguillar v. Texas (1964) 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723.) The tip was very detailed about the aircraft involved, but the information given about the ground vehicles to be used was not only vague, it also did not match this stationwagon. The tip said the vehicle would be a "camper type." No vehicle registrations, license numbers, or other physical description was given. The agents were unable to tell whether this stationwagon was one of the vehicles seen on the airstrip from the air the day before or earlier that day. The agents failed to corroborate any of the ground activity that the tip predicted, which was the only part of the tip that clearly suggested illicit activity. In short, the corroboration failed to meet the Aguillar test.[4] The agents had enough information to found a suspicion to stop the vehicle, but insufficient basis to form probable cause to search it. No information developed after the stop to justify the search that followed immediately.
 
 
 57
 Without the fruit of the stationwagon search, no probable cause existed to sustain the search of the airplane. In absence of the evidence revealed by the illegal searches and seizures, the evidence was insufficient to convict Petersen.
 
 
 58
 I would remand the cases of all defendants other than Petersen for further proceedings consistent with the views herein expressed, and I would reverse Petersen's conviction and remand for a new trial.
 
 
 
 [1]
 The authority of "specially appointed" attorneys to appear before grand juries was not seriously questioned until the Second Circuit decided United States v. Rosenthal in 1903. 121 F. 862 (2nd Cir. 1903). In Rosenthal, the Court held that a "special assistant to the Attorney General" was not empowered by statute to "conduct proceedings before the grand jury," and held that the Attorney General himself was not authorized to appear before grand juries. Id. at 867. In response to the Rosenthal decision, Congress enacted the Act of June 30, 1906, 34 Stat. 816, which is today substantially the same as 28 U.S.C. 515(a). The express purpose of this legislation was to overrule the court's holding. As stated in the House Committee Report:
 The purpose of this bill is to give to the Attorney General, or to any officer in his Department or to any attorney specially employed by him, the same rights, powers, and authority which district attorneys now have or may hereafter have in presenting and conducting proceedings before a grand jury or committing magistrate.
 House Judiciary Comm., Report on H.R. 17714, H.R.Rep. No. 2901, 59th Cong., 1st Sess. 1 (1906). Thus, the statute authorized the Attorney General and those under his control to conduct any type of criminal or civil proceeding, including grand jury proceedings, which United States Attorneys were empowered to conduct.
 Since its enaction in 1906, this statute has been frequently the subject of litigation. The key issue in these cases was whether these specially appointed attorneys had, in prosecuting certain individuals, exceeded the bounds of their limited commissions. Thus, the question inevitably arose whether the Attorney General "specifically directed" the specially appointed prosecutor. Some decisions held that the legislative history of the 1906 Act required an appointment of a special prosecutor to include a degree of specific direction. The majority of cases, however, concluded that Congress did not impose a requirement of specificity. See, e. g., United States v. Amazon Industrial Chemical Corp., 55 F.2d 254 (D.Md.1931); United States v. Huston, 28 F.2d 451 (D.Ohio 1928); United States v. Goldman, 28 F.2d 424 (D.Conn.1928); United States v. Morse, 292 F. 273 (S.D.N.Y.1922); United States v. Martins, 288 F. 991 (D.Mass.1923); United States v. Cohen, 273 F. 620 (D.Mass.1921); May v. United States, 236 F. 495 (8th Cir. 1916); United States v. Powell, 81 F.Supp. 288 (E.D.Mo.1948).
 For recent federal decisions which have interpreted the legislative history of the 1906 Act, see In Re Subpoena of Persico, 522 F.2d 41, 59-61 (2nd Cir. 1975); United States v. Di Girlomo, 393 F.Supp. 997, 1004-05 (W.D.Mo.1975); United States v. Weiner, 392 F.Supp. 81, 84-85 (N.D.Ill.1975); United States v. Brown, 389 F.Supp. 959 (S.D.N.Y.1975). Upon interpreting the legislative history of the 1906 Act and later decisions in regard thereto, the Second Circuit observed:
 The form of the special direction that was required was not touched upon by the statute. Generally, the cases construing section 515(a) (and its earlier version) have tended towards a liberal construction in favor of validity of the indictments.
 In Re Subpoena of Persico, supra, 522 F.2d at 60-61. As discussed later in this decision, we believe that the majority view upholding broad letters of authorization should be followed.
 The factual dispute as to whether the letter to Brannigan signed by Kleindienst was "signed" or "stamped" is in our opinion unimportant with respect to the legality of the authorization.
 
 
 [2]
 McCray v. Illinois, 386 U.S. 300, 305, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); quoting from the "instructively expressed" opinion in State v. Burnett, 42 N.J. 377, 201 A.2d 39 (1964)
 See also United States v. Anderson, 509 F.2d 724, 729-730 (9th Cir.), cert. denied, 420 U.S. 910, 95 S.Ct. 831, 42 L.Ed.2d 840 (1975).
 
 
 [3]
 We note here, parenthetically, that in both this case, and in Boston, the defendants were charged in three count similar indictments, charging one: a conspiracy to commit the crimes of possession and importation, but not the substantive crime of either importation and possession; two: the crime of possession, and three: the crime of importation. Our holding here establishes no new precedent in this area, but rather follows the principle enunciated in United States v. Boston, supra, at 510 F.2d at 37 and 38
 
 
 [1]
 In pertinent part, Prueitt and Hong's motion said:
 "With respect to Counts 1, 2 and 3 in the Indictment, state:
 (a) If JAMES W. BRANNIGAN, JR., Attorney, Department of Justice, has been specially appointed with regard to the instant matter pursuant to Title 28, U.S.C. § 515(a), state the following:
 (1) The location of any document or documents evidencing such special appointment;
 (2) The identity of the person who signed such special appointment;
 (3) The date upon which such special appointment was signed;
 (4) The district or districts to which such special appointment applied.
 (b) If JAMES W. BRANNIGAN, JR., has received special directions with regard to the instant investigation or prosecution pursuant to Title 28, United States Code, § 515(a), state the following:
 (1) The location of any document or documents evidencing such special directions;
 (2) The specific directions included within such documents contained in (1) above.
 (3) The offenses to which such special direction apply.
 (4) The defendants to which such special directions apply.
 (5) The identity of the person who signed such special direction.
 (6) The date upon which such special direction was signed.
 (7) The location at which such special direction was signed.
 (8) The district or districts to which such special direction applied.
 (c) If JAMES W. BRANNIGAN, JR., has been specially appointed or specially directed, or either of them, pursuant to Title 28 U.S.C. § 515(a), and if the person signing such special appointment or special direction is some person other than the Attorney General of the United States, state the following:
 (1) Whether such person has been specifically delegated by the Attorney General to act pursuant to Title 28 U.S.C. § 515(a).
 (2) The date that such delegation occurred.
 (3) The manner in which such delegation was effected.
 (4) The identity of any document or documents evidencing such delegation.
 (5) The authority pursuant to which such delegation was effected."
 
 
 [2]
 The record does not support the majority opinion's conclusion that Mr. Brannigan's duties were "similar to a Strike Force attorney." The record is silent on this point. But even if his duties were identical to those of Strike Force lawyers, his situation cannot be equated to Strike Force lawyers, unless, like them, Mr. Brannigan's authority was limited by guidelines and regulations of the Department of Justice
 
 
 [3]
 Brown is limited to the situation in which none of the counts charged an offense with a possessory ingredient
 
 
 [4]
 None of the cases cited by the majority sustains this search. United States v. Patterson (9th Cir. 1974) 492 F.2d 995 did not involve any informants. In United States v. Archuleta (9th Cir. 1971) 446 F.2d 518, all the details were corroborated. In United States v. Smith (9th Cir. 1974) 503 F.2d 1037, border agents had detained the defendant earlier in the day and had verified the fact that the telephone number then found in the defendant's pocket belonged to a major narcotics dealer. A detailed tip later given simply added the final touch for probable cause. In Gilbert v. United States (9th Cir. 1966) 366 F.2d 923, the defendant did "not seriously contest" probable cause to arrest him based on a host of observations of his conduct together with a detailed tip identifying him as a bank robber. Instead, he argued that he had been arrested earlier, without probable cause, when he had been briefly detained earlier. We held that the earlier encounters were not arrests